[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 25, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-13751

_____

D. C. Docket No. 05-20865-CR-JAL

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROSA MORALES DE CARTY,
BOLIVIA CEDENO,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida

_____

(November 25, 2008)

Before BIRCH, PRYOR and KRAVITCH, Circuit Judges.

PER CURIAM:

Rosa Morales De Carty ("Morales") and Bolivia Cedeno ("Cedeno") appeal their convictions for knowingly and intentionally conspiring to import one kilogram or more of heroin into the United States, in violation of 21 U.S.C. §§ 952(a) and 963 ("Count One"); knowingly and intentionally importing one kilogram or more of heroin into the United States, in violation of 21 U.S.C. §§ 952(a) and 960(b)(1)(b) ("Count Two"); knowingly and intentionally conspiring to possess one kilogram or more of heroin with the intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and 846 ("Count Three"); and knowingly and intentionally possessing one kilogram or more of heroin with the intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A) ("Count Four"). Morales and Cedeno both argue that (1) the evidence was insufficient to sustain their convictions; (2) the district court erred in allowing the government to cross-examine Morales with reference to a specific instance of conduct; and (3) the district court incorrectly instructed the jury. In addition, Morales contends that cumulative trial errors denied her a fair trial and that the district court incorrectly applied an obstruction of justice enhancement in sentencing her. For the reasons that follow, we conclude otherwise and AFFIRM the judgment of the district court.

# I. BACKGROUND

On 6 November 2005, Morales and Cedeno flew from Puerto Plata, Dominican Republic, to Miami, Florida aboard American Airlines flight 978. Upon arriving at Miami International Airport, both Morales and Cedeno were initially met by Customs and Border Patrol ("CBP") inspectors and then referred for separate, secondary CBP inspections. Morales was inspected by Customs Inspector Hector Firpo ("Firpo") and Cedeno was inspected by Inspector Michael Iengo ("Iengo").

During the course of Firpo's inspection, he asked Morales whether she had packed her bags herself and whether anyone had given her anything to bring back to the United States. Morales replied that she had packed her own bags and that no one had given her anything to bring back. See R3 at 35. According to Firpo, Morales then became increasingly nervous as he began to open and inspect her bags.

When Firpo opened Morales's black bag, he immediately smelled a strong vinegar odor. Id. at 38. Firpo testified that, in his experience, the strong smell of vinegar is often a good indicator of the presence of heroin. Inside the bag, Firpo found thirteen pairs of jeans, which appeared to be in "normal use" but were "thick" and "heavy" when picked up and handled. Id. at 40. Upon further

3

inspection, Firpo discovered what would ultimately be stipulated to as 2.56 kilograms of heroin stitched into the linings of the thirteen pairs of jeans. Id. at 40, 160-61.

A secondary inspection of Morales's handbag yielded a valid passport, her Social Security card, a New York driver's license, a Dominican national ID card and airline tickets, a flight itinerary and a receipt. One ticket was issued on 10 October 2005 and was paired with a flight itinerary indicating an outbound flight from New York (JFK) to Santo Domingo, Dominican Republic on 10 October 2005 and a return flight from Santo Domingo to New York scheduled for 12 January 2006. The other ticket was that used by Morales for her 6 November 2005 flight from Puerto Plata to New York, via Miami. The receipt was for the Puerto Plata – New York ticket and it indicated that the flight cost $574 and was paid for in cash. Id. at 51-54.

Iengo started his inspection of Cedeno by checking her travel documents. Cedeno was carrying her 6 November 2005 ticket from Puerto Plata to New York via Miami, a Social Security card, a U.S. permanent resident card and a Dominican passport. Her airline ticket indicated that it cost $574 and that it was purchased with cash on 4 November 2005. Iengo then asked Cedeno, through a translator, to

confirm that she owned the luggage in her possession and that everything in it belonged to her. Cedeno answered both questions affirmatively. Id. at 70.

According to Iengo, he then asked Cedeno about the purpose of her trip. Cedeno responded that she had been visiting family in the Dominican Republic. Iengo noted that Cedeno was evasive in answering his questions and appeared nervous and fidgety. He then asked Cedeno to place her bag on the inspection table and open it. Cedeno complied.

As soon as Cedeno opened the bag, Iengo smelled a strong odor of vinegar emitting from it. Inside the bag, Iengo noticed that some of the clothing – fifteen pairs of jeans – were "folded very fine, like if they were just dry cleaned," whereas the rest of the clothing was wrinkled. Id. at 78-79. This alerted Iengo and caused him to pick up the jeans and go through them by hand. According to Iengo, the jeans were heavier than expected. He continued his investigation of the jeans, turning them inside out, exposing the linings. He cut into the linings and discovered what would ultimately be stipulated to as 2.819 kilograms of heroin. Id. at 85, 162.

Both Morales and Cedeno were then arrested and placed in separate interview rooms in the CBP enforcement area. After both women waived their Miranda rights, see Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966),

5

Special Agent Alvaro Flores ("Flores") of the Department of Homeland Security, Immigration, and Customs Enforcement ("ICE") separately interviewed them about the heroin found in their luggage. Flores interviewed Morales first.

Morales told Flores that, while she was in the Dominican Republic, Cedeno had invited her to travel to La Vega, a town about a four-hour drive from Morales's home in San Pedro. Morales explained that Cedeno paid for the food and lodging during the trip. She further explained that, prior to departing La Vega, Cedeno had taken Morales to her friend Ruben's house. Morales claimed that she did not know Ruben but that she nevertheless agreed to transport several pairs of jeans back to the United States for him. Id. at 134-35. He provided her with a black bag and instructed her to take out some of the clothing in her (green) bag and place the clothes in the black bag. Ruben then layered the jeans on top of her clothing in the black bag. According to Morales, she was told that the jeans were to be delivered to an acquaintance of Cedeno's in New York, who owned a clothing business. Thereafter, Ruben drove Morales and Cedeno to Puerto Plata (about two hours from La Vega) and gave them airline tickets to New York, via Miami. Morales said that she assumed that Ruben had paid for the tickets. Id. at 140.

Flores then interviewed Cedeno, who offered a different version of events. Cedeno maintained that she stayed with Morales at her home in San Pedro during

6

her visit to the Dominican Republic. While at Morales's house, a man named Ramon arrived and asked that Cedeno and Morales deliver some jeans to a man in New York as a favor. Id. at 143. When Flores asked Cedeno to account for Morales's version of events, Cedeno recalled visiting a casino in La Vega prior to heading to the airport in La Plata but denied picking up the jeans from her friend (Ruben) in La Vega. Id. at 145.

Following his interview with Cedeno, Flores returned to Morales and questioned her about Cedeno's version of events. Morales insisted that Cedeno's story was "untrue." Id. at 146. She claimed that she did not know a man named Ramon and would never allow a stranger to enter her home. According to Flores, Morales appeared to be visibly upset with Cedeno.

While imprisoned at the Federal Detention Center awaiting trial, Morales had a phone conversation with her son that was recorded by the government. During the conversation, Morales agreed to tell an attorney the story her son proposed. Morales answered "alright, son, alright" when he told her that she should tell the attorney only that she had agreed to carry a suitcase for a man in Santo Domingo in exchange for $100. R1-103 at 3.

Morales and Cedeno's trial began on 11 April 2006. A week earlier, the government moved in limine to introduce Morales and Cedeno's post-arrest

7

statements at the upcoming joint trial. The government claimed that the Confrontation Clause, see U.S. Const. amend. VI, was not implicated because the statements in question did "not directly implicate the other defendant in any criminal activity." R1-29 at 3. The motion was unopposed and granted by the district court. The government also submitted several proposed jury instructions. The government requested that the district court modify the Eleventh Circuit Pattern Jury Instructions by deleting the willfulness requirement included in the pattern narcotics instructions and replacing it with "knowingly and intentionally." R1-45 at 3-4. The government also requested the inclusion of a deliberate ignorance instruction. The district court later agreed to modify the pattern narcotics instructions as requested by the government and include a deliberate ignorance instruction, both over defense objection. R4 at 159-60, 173-75.

The government called three additional witnesses in addition to Firpo, Iengo, and Flores for its case in chief. Kyle Keenan ("Keenan") was the government's last witness. Keenan, a Drug Enforcement Agency agent, testified as an expert in the field sale and valuation of heroin in Miami. He opined that given the amount and purity of the heroin seized from Morales and Cedeno, it came from a "high-end" player and would likely sell wholesale for approximately $250,000. R3 at 225-26.

8

The defense case consisted almost entirely of Morales's testimony. Cedeno elected not to testify. Morales testified that she lived in New York but often traveled to the Dominican Republic to visit her mother. On 10 October 2005, Morales left New York for the Dominican Republic, planning to return on 12 January 2006. Once in the Dominican Republic, Morales linked up with Cedeno, her childhood friend and cousin, and the two embarked on a sightseeing trip to Santiago via La Vega. Towards the end of October, Morales received a call from her daughter, who asked that she return to New York early in order to look after her son. Morales agreed to return early but not immediately.

While in Santiago, Morales and Cedeno visited a casino, where Morales noticed Cedeno talking to an unknown man. R4 at 34. According to Morales, Cedeno later told her that the man (known as "Ramon" or "Ruben") had asked her if she could do him a favor and take a suitcase back to the United States for him. Morales testified that she and Cedeno decided to go back to New York on about 5 November 2005. Morales testified that she attempted to change her ticket to fly out of Santiago but she was told that all of the flights were full.[1] R4 at 36.

---

[1] On rebuttal, the government called John Little, an American Airlines employee, who testified that there were available seats to Miami on all flights originating from Santo Domingo, Santiago and Puerto Plata during the period between 30 October and 6 November 2005.

Morales then testified that on 6 November 2005, the morning of their return flight to the United States, they met with the man known as "Ramon" or "Ruben." The man arrived with a black suitcase and an additional plastic bag full of clothing. According to Morales, the man placed some jeans in Cedeno's bag but did not place any in Morales's green bag. The remaining jeans stayed in the man's black suitcase, which he then gave to Morales. The man then presented both Morales and Cedeno with an airline ticket from Puerto Plata to New York via Miami.

Morales claimed that she did not smell anything unusual when the man placed the jeans in Cedeno's bag and did not see Cedeno touch any of the jeans. She maintained that she was shocked that the jeans in the black suitcase contained heroin and that she was against drugs, "allergic" to them, and never would have brought them into the United States had she known. R4 at 41-42. In addition, Morales denied that she knew the man who had given her the black suitcase and that the man had ever come to her house.

On cross-examination, Morales conceded that it was strange for Cedeno to agree to carry a suitcase for an unknown man and that it was odd that a complete stranger would purchase $540 airline tickets for her and Cedeno. Morales also disputed those parts of Flores's testimony that conflicted with her version of events at the Miami airport. Morales claimed that she never told Flores that she and

10

Cedeno went to the house of a man named Ruben to pick up some jeans. She also testified that she told Flores that the black suitcase in her possession did not belong to her and that the jeans in the suitcase belonged to Cedeno. The government later recalled Flores on rebuttal who reaffirmed his earlier testimony concerning his interaction with Morales at the airport.

Morales was also cross-examined by Cedeno's lawyer. Cedeno's lawyer asked Morales if she had ever "known Bolivia Cedeno, your cousin, to have been involved in drug activity, drug usage or any other type of illegal activity." R4 at 56. The government objected but the district court allowed the question. Morales responded: "Never. I know her to be a very hard-working woman and a very humane woman, kind woman." Id. As part of its cross-examination, the government then asked Morales whether she knew "that Bolivia Cedeno is being investigated in the Dominican Republic." R4 at 113. This question drew an objection from Cedeno's lawyer and a motion for a mistrial. The government responded that Cedeno's lawyer had opened the door with his previous line of questioning. After the government proffered that it had a good faith basis to believe that Cedeno was under investigation in the Dominican Republic, the district court overruled the objection and allowed the government to ask the

11

question.[2]  Morales responded in the negative and the government did not ask any additional questions regarding Cedeno's character.

Morales and Cedeno were convicted on all counts.  Cedeno was sentenced to 120 months of imprisonment.  Morales, who received a two-level obstruction of justice enhancement, was sentenced to 126 months of imprisonment.  They now appeal their convictions to us.  We address each of their arguments in turn.

## II. DISCUSSION

A. <u>Sufficiency of the Evidence</u>

"We review <u>de novo</u> a defendant's claim that the evidence was insufficient to convict him, viewing the evidence and all reasonable inferences and credibility choices in the light most favorable to the government."  <u>United States v. Anderson</u>, 289 F.3d 1321, 1325 (11th Cir. 2002).  A jury's verdict must stand "if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt."  <u>United States v. Herrera</u>, 931 F.2d 761, 762 (11th Cir. 1991).

In this case, Morales and Cedeno argue that the government failed to prove that they intended to import or possess with intent to distribute a controlled

---

[2] The government's good-faith basis was an assertion of the existence of an on-going investigation by the Dominican Republic of a person named Tego, "who is a person associated specifically with Bolivia Cedeno."  R4 at 121.

substance or conspired to do so. It is well established in our circuit that "[t]o sustain conviction of the substantive offense of possession, the government must prove knowing possession of a controlled substance with intent to distribute it." United States v. Montes-Cardenas, 746 F.2d 771, 778 (11th Cir. 1984). We have held that "[p]ossession may be actual or constructive" and "can be established by circumstantial or direct evidence." Id. The "[i]ntent to distribute may be inferred from the quantity of [the controlled substance] seized." Id. at 778-79. A conviction for importation must be supported by evidence of knowledge that the drugs were intended for the United States. See United States v. Champion, 813 F.2d 1154, 1168 (11th Cir. 1987). Finally, "[t]o sustain a conviction for conspiracy . . . the government must prove beyond a reasonable doubt that (1) an illegal agreement existed; (2) the defendant knew of it; and (3) the defendant, with knowledge, voluntarily joined it." United States v. McDowell, 250 F.3d 1354, 1365 (11th Cir. 2001). Again, we note that "[i]t is not necessary to prove a defendant's participation in a criminal conspiracy by direct evidence" but a "common purpose and plan may be inferred from a 'development and collocation of circumstances.'" Id. (quotation marks and citation omitted).

We are convinced that the evidence is sufficient to support Morales and Cedeno's convictions. Over two and a half kilograms of heroin were found in each

13

of their bags (five kilograms being valued at about $250,000).[3]  Both Morales and

Cedeno claimed ownership of their bags and all of the contents therein just before

being inspected by officials at the Miami airport.  Each of their bags smelled

strongly of vinegar.  Both Morales and Cedeno accepted free airline tickets with a

value of over $500 each in exchange for delivering several pairs of jeans from the

Dominican Republic to the United States.  Finally, Morales's testimony regarding

her inability to change her ticket was proven false and the additional

inconsistencies between her trial testimony and her post-arrest statements may

have caused the jury to use her testimony as substantive evidence of her guilt.  See

United States v. Allison, 908 F.2d 1531, 1535 (11th Cir. 1990) (noting that "[t]he

jury may view [the] defendant's false explanatory statement as substantive

evidence proving guilt").

B.  Improper Cross-Examination

We review a district court's decision on the proper bounds of cross-

examination for abuse of discretion.  See United States v. Baptista-Rodriguez, 17

F.3d 1354, 1370-71 (11th Cir. 1994).  Morales and Cedeno contend that the district

court erred in allowing the government to cross-examine Morales with reference to

---

[3] We have held "that a reasonable jury could conclude beyond a reasonable doubt that a person who is caught with luggage containing a significant amount of drugs knew of the presence of the drugs."  United States v. Quilca-Carpio, 118 F.3d 719, 721-22 (11th Cir. 1997) (per curiam).

14

a specific instance of conduct – namely, Cedeno's status as a target of an ongoing investigation by the Dominican Republic. Based on the following rationale, we conclude otherwise.

Federal Rule of Evidence 405(a) provides that:

> In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

Federal Rule of Evidence 405(a). Our circuit has long recognized that the government may cross-examine a witness about relevant specific instances of conduct in cases in which character evidence is elicited on direct examination. See United States v. Adair, 951 F.2d 316, 319 (11th Cir. 1992) ("It is well settled that once a witness has testified about a defendant's good character, cross-examination inquiry is allowed as to whether the reputation witness has heard of particular instances of conduct relevant to the trait in question"). "A trial court's discretion, however, is subject to two limitations: (1) the government must have a good faith factual basis for the incidents raised during cross-examination of the witness; and (2) the incidents inquired about must be relevant to the character traits at issue in the case." Id. A party cross-examining a character witness may ask that witness about a specific act committed by the subject of her testimony because the inquiry

15

is not directed toward proving the conduct of the subject but rather toward evaluating the credibility of the character witness.

In this case, the district court did not abuse its discretion in allowing the government to cross-examine Morales on a specific instance of Cedeno's conduct. Morales testified that she had never known Cedeno to have been involved with any kind of drug-related activity and that she knew Cedeno to be "a very hard-working woman and a very humane woman, kind woman." R4 at 56. The government's inquiry about Cedeno's apparent involvement in drug-related activity in the Dominican Republic tested the reliability of Morales's perception about Cedeno and was amply supported by the government's proffer of a good faith factual basis for making the inquiry.

C. Jury Instructions

"We apply a deferential standard of review to a trial court's jury instructions. Under this standard, we will only reverse if we are left with a substantial and eradicable doubt as to whether the jury was properly guided in its deliberations." United States v. Puche, 350 F.3d 1137, 1148 (11th Cir. 2003) (quotation marks and citations omitted). In this case, Morales and Cedeno argue that the district court erred in instructing the jury in two respects. Morales contends that the district court erred in omitting willfulness from the jury instructions. Cedeno argues that

16

the district court erred in providing a deliberate ignorance instruction. We consider each argument in turn.

1. Willfulness

Pursuant to the government's request and over defense objection, the district court altered the Eleventh Circuit Pattern Jury Instructions (pattern narcotics instructions) by replacing the term "willfully" with the language "knowingly and intentionally." Our inquiry centers on whether the charged offenses require proof that Morales acted willfully. We conclude that they do not. The narcotics statutes at issue do not contain a "willfulness" element. See 21 U.S.C. §§ 841, 952(a). In addition, the indictment in this case mirrored the statutory language of §§ 841, 846, 952(a), and 963 by charging that Morales and Cedeno "knowingly and intentionally" conspired to possess with the intent to distribute and import heroin and "knowingly and intentionally" possessed and imported heroin. R1-11 at 1-3. Although we have noted that "the term 'willfully' has many meanings and its construction is often influenced by its context," United States v. Phillips, 19 F.3d 1565, 1576 (11th Cir. 1994) (quotation marks, alterations and citation omitted), we need not parse its meaning here as the term does not appear in either the statutory language of the charged offenses or in the indictment. Suffice it to say, as we have before, that the inclusion of the words "knowingly and intentionally" in the

17

statutory language of the charged offenses "tilts against any possibility that Congress intended any additional scienter requirement." United States v. Polar, 369 F.3d 1248, 1252 (11th Cir. 2004).[4]

## 2. Deliberate Ignorance Instruction

Cedeno challenges the district court's inclusion of an instruction on deliberate ignorance. She contends that the instruction was inappropriate because all of the evidence pointed to Morales and Cedeno's actual knowledge, rather than deliberate ignorance. Over defense objection, the district court instructed the jury as follows:

> When knowledge of the existence of a particular fact is an essential part of an offense, such knowledge may be established if the Defendant is aware of a high probability of its existence unless the Defendant actually believes that it does not exist.
>
> So with respect to the issue of the Defendants' knowledge in this case, if you find from all the evidence beyond a reasonable doubt that the Defendants believed that they possessed heroin, a controlled substance, and deliberately and consciously tried to avoid learning that there was heroin in the package, so possessed in order to be able to say if apprehended that they did not know the content of the package, you may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge.
>
> In other words, you may find that a Defendant acted knowingly if you find beyond a reasonable doubt either, one, that the Defendant actually

---

[4] We reiterate our previous holding that "pattern jury instructions are not precedent and cannot solely foreclose the construction of the necessary elements of a crime as stated in the statute." Polar, 369 F.3d at 1253 (quotation marks and citation omitted).

knew that she possessed heroin; or, two, that she deliberately closed her eyes to what she had every reason to believe was the fact.

I must emphasize, however, that the requisite proof of knowledge on the part of the Defendants cannot be established by merely demonstrating that the Defendants were negligent, careless or foolish.

R5 at 207-08. We have held that the deliberate ignorance instruction should not be given "when the relevant evidence points only to *actual knowledge*, rather than deliberate avoidance." United States v. Perez-Tosta, 36 F.3d 1552, 1565 (11th Cir. 1994) (quotation marks and citation omitted). That being said, we have also "agree[d] with the view expressed by other circuits that where the evidence supports both actual knowledge and deliberate ignorance, the instruction is properly given." United States v. Arias, 984 F.2d 1139, 1143 (11th Cir. 1993) (quotation marks and citations omitted).

In this case, the evidence supports both actual knowledge and deliberate ignorance. Morales and Cedeno each claimed to know nothing about the heroin found in their respective bags. Additionally, both women claimed that they were merely delivering clothing for the other's friend and neither questioned why a man would buy them airline tickets valued at over $500 in exchange for carrying a few pairs of jeans to the United States. Because the evidence at trial cut both ways, we conclude that the district court did not err in providing the deliberate ignorance instruction to the jury.

19

D. Cumulative Error

Morales argues that district court's jury instructions (substituting "knowingly and intentionally" for "willfully" and instructing on deliberate ignorance), the spillover prejudice from the government's cross-examination of Morales with reference to Cedeno's alleged involvement in drug-trafficking, and the government's improper vouching and improper remarks during closing argument, amount to cumulative error and warrant a new trial. We review a claim of cumulative error de novo. United States v. Calderon, 127 F.3d 1314, 1333 (11th Cir. 1997) ("In addressing a claim of cumulative error, we must examine the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial."). Our threshold inquiry concerns whether Morales's assertions of error are correct.

As previously discussed, we discern no error in the jury instructions as provided by the district court and conclude that the government's cross-examination of Morales regarding Cedeno's alleged investigation by the Dominican Republic was within the permissible bounds of Rule 405(a). That leaves us with Morales's contention that the government improperly vouched for witnesses and made improper comments during its closing argument. We address each allegation in turn.

20

1. Vouching

The government made the following comments during its closing argument:

Agent Flores and Officer Firpo and Officer Iengo – they have no reason to tell you not – they have no reason not to tell you the truth. They told you how it was because that's their job. And there is no evidence that they had any personal stake in this case. Just doing their job.

R5 at 113. "The test for improper vouching is whether the jury could reasonably believe that the prosecutor was indicating a personal belief in the witness' credibility." United States v. Sims, 719 F.2d 375, 377 (11th Cir. 1983). In other words, did the government "place the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity"? Id. In this case, we conclude that the answer is no. Here the government underscored the lack of any bias evidence that might dilute the strength of Flores, Firpo and Iengo's testimony. The government never provided an explicit assurance that the witnesses were telling the truth but only highlighted the lack of any evidence suggesting that they were not.

2. Improper Commentary

In its closing argument, the government noted that the evidence adduced at trial had revealed at least five different versions of events surrounding the charged

21

offenses. R5 at 102-08. In rebuttal closing, and in response to defense counsel's argument that the government's entire case was built on inconsistencies, the government again highlighted the discrepancies in the stories offered by Morales and Cedeno. There was no objection to any of this argument.

It is well established that the government "does not commit error in attacking witness credibility on the basis of inconsistencies between his testimony and other evidence." United States v. Russell, 703 F.2d 1243, 1248 (11th Cir. 1983). In this case, the government did not urge the jury to convict Morales on the basis of Cedeno's statements but rather invited the jury to juxtapose Morales's multiple versions about what transpired with Cedeno's version. In addition, the district court instructed the jury that "the case of each Defendant should be considered separately and individually," R5 at 209, and that any post-arrest statement made by one defendant "should not be considered in any way whatsoever as evidence with respect to any other defendant on trial." R5 at 199. After closely examining the government's closing remarks and the district court's instructions, we conclude that Morales's cumulative error argument has no merit. We now turn to Morales's sentencing argument.

E. Sentencing

At sentencing, the district court imposed a two-level obstruction of justice enhancement, finding that Morales testified falsely at trial (1) that she did not know that she was importing drugs, and (2) that she accepted the free airline ticket because she could not change her flight reservations. R6 at 53. This enhancement increased Morales's offense level to 31, which, when coupled with her criminal history category of I, yielded a guideline range of 120-135 months of imprisonment, taking into account the ten-year mandatory minimum sentence. U.S.S.G. Ch.5, Pt.A (Nov. 2005); R6 at 55.

Morales contends that the district court erred in applying the § 3C1.1 enhancement. She presents a two-fold argument. First, Morales argues that the jury's verdict might have been based on the deliberate ignorance standard, in which case it would not have been inconsistent with her testimony. Second, Morales contends that she never testified that she was required to accept the free airline ticket.

For an obstruction of justice enhancement, we "review the district court's findings of fact for clear error and the application of the Guidelines to those facts *de novo*." United States v. Bradberry, 466 F.3d 1249, 1253 (11th Cir. 2006) (per curiam). Under clear error review, when two permissible views of the evidence

exist, the factfinder's choice between them will not be clearly erroneous. See United States v. Stewart, 65 F.3d 918, 926 (11th Cir. 1995). Furthermore, the district court's credibility determinations are entitled to great deference. See United States v. Lewis, 115 F.3d 1531, 1538 (11th Cir. 1997) (per curiam).

The government has the burden of proving that a § 3C1.1 enhancement is applicable. United States v. Cataldo, 171 F.3d 1316, 1321 (11th Cir. 1999). If a defendant challenges one of the factual bases for her sentence, the government must prove the disputed fact by a preponderance of the evidence. Id.

The guidelines provide that the district court is authorized to assess a two-level enhancement if "the defendant willfully obstructed . . . the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1 (Nov. 2005). Obstructive conduct includes the commission of perjury. Id. at comment. (n.4). Perjury occurs when a witness, testifying under oath, "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory". United States v. Dunnigan, 507 U.S. 87, 94, 113 S. Ct. 1111, 1116 (1993). Material matters include those that "would tend to influence or affect the issue under determination." U.S.S.G. § 3C1.1. comment. (n.6).

Although the district court should make specific findings regarding perjury, a general finding of perjury is sufficient if the record demonstrates all the factual predicates of perjury. United States v. Dobbs, 11 F.3d 152, 154 (11th Cir. 1994). When multiple instances of obstruction are at issue, we will uphold the district court's enhancement if the record supports at least one finding of obstruction. See United States v. Ndiaye, 434 F.3d 1270, 1303 (11th Cir. 2006), cert. denied, Diaw v. United States, __U.S.__, 127 S. Ct. 128 (2006).

The district court's finding that the evidence at trial contradicted Morales's testimony is supported by the record. Contrary to Morales's contention, the district court did not premise its finding of perjury solely on a finding that Morales's testimony regarding her knowledge of the presence of the heroin was contradicted by the jury verdict. The government argued that the evidence contradicted Morales's testimony regarding her knowledge, and the district court explicitly found that both the evidence at trial and the jury's verdict contradicted her testimony. R6 at 53.

Circumstantial evidence adduced at trial showed that Morales had knowledge of the drugs in her luggage and that evidence conflicted with her testimony. Over two and a half kilograms of high-grade heroin, valued at over $100,000, was found in her bag. Morales claimed ownership of the bag and all of

the contents therein just before being inspected by officials at the Miami airport. Her bag smelled strongly of vinegar. And Morales accepted a free airline ticket with a value of over $500 in exchange for delivering several pairs of jeans from the Dominican Republic to the United States for a man who she did not know. The record does not indicate that the contradiction between the evidence and Morales's testimony was the result of confusion, mistake or faulty memory. Her testimony regarding knowledge of the presence of the drugs (or rather lack of knowledge) was under oath and material. Accordingly, the district court did not err in finding that Morales committed perjury and correctly applied the § 3C1.1 enhancement.

## III. CONCLUSION

Morales and Cedeno appeal their multiple convictions for importing or possessing with intent to distribute a controlled substance and conspiring to do so. Morales also challenges her sentence. We conclude that the arguments advanced by Morales and Cedeno are unavailing. Accordingly, we AFFIRM.