309 Ga. 860
FINAL COPY

S20A0967.   GRIFFIN v. THE STATE.

ELLINGTON, Justice.

A Forsyth County jury found Donald Griffin guilty of felony murder in connection with the stabbing death of Truitt Cheeley.[1] Griffin appeals from the order denying his motion for a new trial, contending that the trial court erred in admitting into evidence witness testimony about Griffin's racism and Griffin's custodial statement. Griffin also claims that his trial counsel was constitutionally ineffective. Finally, Griffin contends that the trial court erred in denying his request to cross-examine a witness who

---

[1] Griffin was indicted by a Forsyth County grand jury on November 9, 2015, for malice murder, felony murder, aggravated battery, and aggravated assault. Following a trial commencing on November 1, 2016, the jury acquitted Griffin of malice murder but found him guilty on the remaining counts. The trial court sentenced Griffin to life in prison for felony murder and merged the aggravated battery and aggravated assault counts into the felony murder conviction. Griffin filed a motion for a new trial on November 7, 2016, which he subsequently amended. Following a hearing on the motion for a new trial, the trial court entered an order denying it on April 23, 2019. Griffin filed a notice of appeal on May 9, 2019. This case was docketed to this Court's April 2020 term and was submitted for a decision on the briefs.

testified as to Cheeley's reputation for peacefulness with evidence that Cheeley had been convicted of a crime of violence. As explained below, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at Griffin's trial showed the following. Griffin worked as a long-haul trucker. When he was not driving, he often stayed with his former girlfriend, Diane Abeyta. Long after Griffin and Abeyta's romantic relationship had ended, Griffin remained a father figure to Abeyta's children and provided the family with financial support. In 2015, Abeyta lived in a two-bedroom mobile home in Forsyth County with several members of her extended family, including two of her adult children, Richard and Stacie. Stacie was in a romantic relationship with Cheeley, and she and Cheeley shared a room in the home. Richard was dating Lisa Escamilla, who was then pregnant. Griffin, who is white, did not approve of Stacie's relationship with Cheeley, because Cheeley was African American. He had similar feelings about Richard's relationship with Escamilla, who is Puerto Rican and dark-skinned.

On the afternoon of May 16, 2015, Griffin returned from a long-haul job and went to Abeyta's home. Griffin, Abeyta, and her children did some shopping together, including going to the liquor store. Griffin bought beer and a bottle of vodka. Stacie bought whiskey for Cheeley. When the group returned to Abeyta's home, Griffin started drinking. Abeyta and her children did not like it when Griffin drank because he became verbally abusive. When he was very drunk, his personality changed. He was angry and aggressive, and he was more likely to use racial slurs. At some point during the afternoon, Griffin went to the kitchen to prepare some food. While in the kitchen, he picked up a kitchen knife and announced that "someone was going to get stabbed tonight." Abeyta and Stacie testified that they told Griffin to put the knife away, but he instead threw the knife onto the counter.

When Escamilla and Cheeley arrived at Abeyta's home later that evening, Griffin had consumed several beers and several mixed drinks. Richard testified that Griffin was slurring his speech and acting "goofy." Escamilla sat with Stacie and Abeyta; Cheeley joined

Richard and Griffin, who were talking and drinking. Sometime later, Escamilla's water broke and she went into labor. Abeyta and Stacie decided to take Escamilla to the hospital. They tried to get Richard and Cheeley to come along, but the men said no because they had been drinking. This prompted an argument between Richard and Escamilla, after which Richard stepped outside to the porch with Cheeley, who offered Richard relationship advice. Griffin followed, also offering Richard advice. Richard testified that Griffin and Cheeley argued with each other over who was giving him the best advice. The conversation "went downhill" from there, and Griffin got angry and "handsy," grabbing Cheeley's shoulders. Cheeley sought to mollify Griffin by putting his arm around him, but, according to Richard, the argument felt like it was getting "more and more aggressive." To defuse the situation, Richard walked away from Griffin, and Cheeley followed him. Cheeley and Richard spent some time walking together outside.

Richard testified that, when he and Cheeley returned to the porch and sat down together to have a cigarette, Griffin returned

and put his hands on Cheeley's shoulders and loudly demanded that his opinion be heard. According to Richard, Cheeley repeatedly moved away from Griffin, eventually leaving them to go inside, where he sat down on a futon mattress in the living room. Cheeley played video games and called Stacie, who was at the hospital. According to Stacie, Cheeley said that he was going to bed and that he would see her when she got home. Meanwhile, outside on the porch, Griffin continued arguing with Richard, who was attempting to distract Griffin and keep him away from Cheeley. When Griffin tried to go inside, Richard blocked the door. Richard testified that, when he told Griffin to leave Cheeley alone, Griffin cursed at him and walked down the driveway toward the main road. Moments later, however, Richard heard shouting coming from inside the trailer. Richard went inside and found Griffin sitting next to Cheeley, who was lying on the futon. Griffin had entered the home through the back door. Richard did not know what they were arguing about, but Cheeley told Griffin repeatedly to leave him alone because he was trying to sleep. When Cheeley refused to

engage with Griffin, Griffin called him a "n****r." According to Richard, Cheeley was visibly upset. Cheeley retorted: "That's all you care about[,] . . . it doesn't matter what color you are[.]" He then told Richard: "[Griffin's] ignorant, that's all he cares about, that's the first thing he thinks about."

Both men stood up and angrily shouted at each other. According to Richard, Griffin reached toward Cheeley in an aggressive manner and Cheeley reacted by punching Griffin in the mouth so hard that he knocked out one of Griffin's teeth. Richard broke up the ensuing fight and pushed Cheeley into the hallway, away from Griffin. As Richard pushed Cheeley toward the back bedroom, urging him to calm down, Griffin and Cheeley continued to yell at each other. Richard saw Griffin walk toward the kitchen. After a moment, Cheeley tried to leave through the back door. Worried that Griffin and Cheeley would continue fighting outside, Richard encouraged Cheeley to remain inside and talk with him. As Cheeley calmed down, he complained to Richard about Griffin's behavior and said, "If I have to, I'll just leave in the morning. I don't

have to live here."

After a few minutes, Richard walked with Cheeley toward one of the bedrooms, where Richard hoped the two could hang out and play some games. Richard testified that, as they approached the bedroom, Cheeley suddenly grabbed him and pushed him to the floor. When Richard looked up, he saw that Griffin had reappeared and that he and Cheeley were standing very close together, as if they were hugging. When Richard pushed the two men apart, he got blood on his hands. He saw that Griffin was holding a large kitchen knife. Richard wrestled Griffin away from Cheeley, holding him tightly by the neck. As he did so, Cheeley slumped to the floor. Richard dragged Griffin out to the porch and left him there. He then ran inside to call 911 and to help Cheeley. As he spoke with the 911 operator, Richard walked outside to verify the address and to look for the first responders. While outside, Griffin and Richard got into a fight and Griffin knocked the phone out of Richard's hand. During the fight, Griffin said, "beat the s**t out of me, kill me, mother f****r, just kill me." Richard testified that, when he could not find the phone, he

began screaming for help.

The police arrived at the Abeyta home just after midnight and found Griffin sitting on the porch. Richard ran to the police, frantically telling them that Griffin had stabbed Cheeley. Griffin, who was covered in blood and smelled of alcohol, volunteered, "Yeah, I stabbed him." He said that he did not care whether Cheeley "lived or died and that he was defending himself." He also asked one of the officers what his chances were of "getting out of it." Richard, however, was extremely distraught and kept asking if Cheeley was okay. The officers handcuffed Griffin and Richard and had both men lie on the ground while they investigated the crime scene.

After additional officers arrived at the Abeyta home, an officer took Richard and Griffin to the police station to be interviewed. Just before he was transported, Griffin, who was sitting in the patrol car, volunteered that he and Cheeley had gotten into an argument and that he had stabbed Cheeley. In a later custodial interview, Griffin again admitted stabbing Cheeley, asserting that he had been defending himself.

Cheeley died of his wounds in the emergency room. Crime scene personnel recovered a bloody kitchen knife from the hallway floor. The medical examiner testified that Cheeley had four cuts to his body, three stab wounds to his torso and a superficial incision on the right side of the neck. One of the stab wounds entered the left side of the upper chest, severed the left fourth rib, and penetrated the heart. The other two stab wounds entered Cheeley's back on the right side. Cheeley's hands had no defensive injuries. The medical examiner determined that the cause of death was the stab wound to the heart.

While Griffin was in custody, he wrote letters to Abeyta and Stacie. In the letter to Stacie, Griffin wrote that Cheeley's death was her fault because she had brought him into the household. "He was no good. His type was no good to be a part of our family." In the letter to Abeyta, Griffin wrote that Cheeley had attacked him and that, "if Stacie would have never got involved with him, the n****r, none of this would have happened."

Griffin does not contest the legal sufficiency of the evidence

supporting his conviction. Nevertheless, in accordance with this Court's current practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdict, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Griffin guilty beyond a reasonable doubt of felony murder.[2] See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Griffin contends that the court erred in admitting into evidence irrelevant testimony concerning his bad character for racism and his use of racial slurs. For the follow reasons, this claim of error is without merit.

The record shows that the prosecutor elicited from the State's witnesses testimony that Griffin did not like black people, frequently used racial slurs, and disapproved of racially mixed relationships. As Griffin concedes, no objection was made when this

---

[2] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 392 (4) (b) (846 SE2d 83) (2020). The Court began assigning cases to the December Term on August 3, 2020.

evidence was introduced at trial, so we review this claim only for plain error. See OCGA § 24-1-103 (d). To establish plain error, Griffin

> must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings. To show that the error affected his substantial rights, [Griffin] is required to show that error probably affected the outcome of his trial.

(Citations and punctuation omitted.) *Bozzie v. State*, 302 Ga. 704, 707 (2) (808 SE2d 671) (2017).

Griffin cannot establish plain error in this case because the record shows that the error alleged was affirmatively waived when defense counsel made the decision to use strategically the evidence of Griffin's past racism and use of racial slurs to bolster his claim of self-defense and to undermine the State's case. During the hearing on Griffin's motion for a new trial, defense counsel testified that Griffin insisted on presenting a claim of self-defense at trial. Counsel agreed that Griffin's best defense was self-defense, and that, in

furtherance of that defense, it was essential to prove that Cheeley was the aggressor. Counsel testified that the defense theory was that Griffin, while very drunk, used a racial slur that infuriated Cheeley. Cheeley, who was also drunk, reacted by punching Griffin in the face and violently attacking him. Fearful that Cheeley would beat him to death, Griffin grabbed the kitchen knife to protect himself from Cheeley, who was a much younger and stronger man. Counsel testified that he was aware that the State would likely use the evidence of Griffin's racism to show that Griffin was motivated by racial animus and that he acted with malice when he stabbed Cheeley – evidence that counsel believed was admissible for those purposes.[3] Therefore, counsel questioned prospective jurors on whether they could fairly try the case knowing that evidence of Griffin's racism and use of racial slurs would be admitted into evidence. Counsel also sought to mitigate any inference that Griffin

---

[3] See *Capps v. State*, 300 Ga. 6, 7 (2) (792 SE2d 665) (2016) (trial counsel not ineffective for failing to object to witness testimony recounting defendant's statements about killing African Americans, as the evidence was admissible to show defendant's racial animus and possible motive for killing the African-American victim).

harbored racial animus toward Cheeley. At trial, counsel elicited testimony to show that, although Griffin had been raised in a racist family and sometimes used racial slurs, he nevertheless had a good relationship with his black employers, he and Cheeley were friends, he had not used racial slurs in Cheeley's presence previously, and he had provided Cheeley with a car and had helped him out financially. Defense counsel also argued that the State was injecting race into the prosecution because its case against Griffin was weak. Defense counsel contended that the State's case, which lacked strong forensic evidence and relied on Richard's allegedly unreliable testimony, was mostly "smoke and mirrors."

It is clear from the record before us that Griffin made a strategic decision not to object to the evidence of his racism and, instead, sought to incorporate it into his defense theory. Under the circumstances, his strategic decision in doing so was the equivalent of an affirmative waiver. For purposes of plain error review, an affirmative waiver is "the intentional relinquishment or abandonment of a known right[,]" and the mere failure to object does

not constitute such an affirmative waiver; rather, it "is more appropriately described as a forfeiture[.]" (Citations and punctuation omitted.) *Cheddersingh v. State*, 290 Ga. 680, 684 (2) (724 SE2d 366) (2012). However, the appellate court can conclude that the defendant intentionally relinquished or abandoned a known right "if the appellate court can discern a tactical reason on the part of the defense" for failing to take appropriate action to preserve that right. (Citation and punctuation omitted.)*Vasquez v. State*, 306 Ga 216, 229-230 (2) (c) (830 SE2d 143) (2019). "Federal courts have articulated a similar approach to plain error review where it appears that the failure to make a request or an objection was based on counsel's tactical choice." (Citations omitted.) Id. at 230 (2) (c).[4]

---

[4] See, e.g., *United States v. Etienne*, 772 F3d 907, 913 (II) (A) (1) (1st Cir. 2014) ("We reverse only sparingly in the plain error context, and we should be especially loath to do so where it appears from the record that a failure to object was the result of counsel's trial tactics." (citation and punctuation omitted)); *United States v. Yu-Leung*, 51 F3d 1116, 1122-1123 (C) (2) (2d Cir. 1995) (Because it was apparent that the failure to object to certain evidence was a strategic choice, the appeal of the admission of the evidence was waived.); *United States v. Coonan*, 938 F2d 1553, 1561 (1) (b) (2d Cir. 1991) (Where a defendant unsuccessfully attempted to distance himself from "the type of violence and brutality that signified" gang membership and strategically "welcomed the admission of macabre details" of the gang's violent activities

We have reviewed the entire trial transcript in this case, including counsel's opening statement and closing argument and his cross-examination of the State's witnesses. It is evident from the transcript that defense counsel explicitly urged the jury to find that the State was improperly injecting race into the trial to cover up weaknesses in its case, arguing, for example: "[Y]ou're supposed to sit there and because [Griffin] said the N word, you're supposed to convict him on that. Well, it's not realistic, is it? Because one has nothing to do with the other." Counsel argued that, even if the jury believed Richard's account of how the drunken brawl had occurred, Griffin was nevertheless defending himself from Cheeley, who had violently attacked him first. Thus, the record shows that Griffin, by choosing to incorporate the evidence of his racism into his defense theory instead of objecting to it, intentionally relinquished any claim that the trial court erred in admitting that evidence. This claim of error therefore fails at the first step of plain error review. See id.

_____

prior to his joining, he "waived appellate review" of any plain error claim concerning the admission of that evidence. (citations omitted)).

3. Griffin contends that his trial counsel was ineffective for failing to object to the introduction of evidence concerning Griffin's racism. For the following reasons, we disagree.

To prevail on his claim of ineffective assistance of trial counsel, Griffin must prove both that counsel's performance was professionally deficient and that he was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Terry v. State*, 284 Ga. 119, 120 (2) (663 SE2d 704) (2008). To prove deficient performance, Griffin must show that his counsel performed in an "objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." (Citation omitted.) *Romer v. State*, 293 Ga. 339, 344 (3) (745 SE2d 637) (2013). "[R]easonable trial strategy and tactics do not amount to ineffective assistance of counsel." (Citation omitted.) *Johnson v. State*, 286 Ga. 787, 791 (2) (692 SE2d 575) (2010). To prove prejudice, Griffin "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable

probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). "This burden is a heavy one[.]" (Citation omitted.) *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019). And if Griffin fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test. See *Palmer v. State*, 303 Ga. 810, 816 (IV) (814 SE2d 718) (2018).

As set forth in Division 2, defense counsel made a strategic decision not to object to evidence of Griffin's racism and racist language. He reasoned that the evidence would show why Cheeley attacked Griffin, and it was critical to his claim of self-defense to show that Cheeley was the aggressor. Counsel also testified that he was aware of the prejudice that might inure to Griffin as a result of the admission of the evidence; consequently he sought to mitigate that prejudice. Griffin contends, however, that counsel's strategy was unreasonable, arguing evidence of Griffin's racism would have been inadmissible character evidence pursuant to OCGA § 24-4-404 (a) ("Evidence of a person's character or a trait of character shall not

be admissible for the purpose of proving action in conformity therewith on a particular occasion[.]").

In evaluating the reasonableness of trial strategy, every effort should be made "to eliminate the distorting effects of hindsight." (Citation and punctuation omitted.) *Davis v. State*, 306 Ga. 140, 143-144 (3) (829 SE2d 321) (2019). "Thus, deficiency cannot be demonstrated by merely arguing that there is another, or even a better, way for counsel to have performed." Id. In this case, even if Griffin is correct in asserting that counsel may have successfully moved to exclude some or all of the evidence of Griffin's racism, that does not end the inquiry. As counsel explained during the hearing on the motion for a new trial, it was essential to his justification defense to show that Cheeley was the first aggressor. It was helpful to his defense to show that Griffin's racism and his use of a racial slur triggered Cheeley to violently attack him. Given counsel's founded, reasonable belief that Griffin was best served by using this evidence to his advantage instead of objecting to it, counsel's decision amounted to reasonable trial strategy that does not

constitute deficient performance. Because Griffin failed to show that counsel's performance was deficient in this respect, the trial court did not err in denying his claim of ineffective assistance of counsel. See, e.g., *Naples v. State*, 308 Ga. 43, 54 (3) (a) (838 SE2d 780) (2020) (counsel's decision to not object to character evidence of defendant's multiple affairs so that the jury could infer that defendant was not the jealous type was a reasonable strategic decision and a matter of reasonable trial tactics); *Ford v. State*, 290 Ga. 45, 48 (5) (a) (717 SE2d 464) (2011) (counsel's decision to not object to character evidence that defendant had failed to provide for his children so that the jury could infer witness bias against the defendant was a matter of reasonable trial strategy); *Jennings v. State*, 288 Ga. 120, 123 (6) (c) (702 SE2d 151) (2010) (counsel's decision to not object to character evidence that defendant was "bad news" and had been seen "at the jail" so that the jury could infer witness bias against the defendant was a matter of reasonable trial strategy).

4. Griffin argues that the trial court should have suppressed his custodial statement because he was "too drunk and sleepy to

knowingly and voluntarily waive his rights prior to his police interview."[5] Griffin argues that the evidence adduced during the *Jackson-Denno*[6] hearing and at trial shows that his statement failed to pass the "coherency test." For the following reasons, we disagree.

"The trial court determines the admissibility of a defendant's statement under the preponderance of the evidence standard considering the totality of the circumstances." (Citation omitted.) *Vergara v. State*, 283 Ga. 175, 176 (657 SE2d 863) (2008). "Although we defer to the trial court's findings of disputed facts, we review de novo the trial court's application of the law to the facts." (Citation omitted.) *Clay v. State*, 290 Ga. 822, 823 (1) (725 SE2d 260) (2012). And following a *Jackson-Denno* hearing, this Court "will not disturb the trial court's factual and credibility determinations unless they are clearly erroneous." (Citation omitted.) *Wright v. State*, 285 Ga. 428, 432 (2) (677 SE2d 82) (2009). However, "[w]here controlling

---

[5] Griffin does not challenge the admissibility of the statements he made at the scene of the crime. The trial court ruled that those statements were non-custodial and were not prompted by police questioning.

[6] *Jackson v. Denno*, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

facts are not in dispute, . . . such as those facts discernible from a videotape, our review is de novo." (Citation and punctuation omitted.) *Vergara*, 283 Ga. at 178 (1). Additionally,

> [t]o determine whether a statement was made involuntarily due to intoxication or the influence of drugs, courts look to the totality of the circumstances and consider factors including lucidity, coherency, manner of speech, and awareness of circumstances. Moreover, evidence of intoxication, alone, is not enough to render a statement involuntary.

(Citations omitted.) *Evans v. State*, 308 Ga. 582, 587 (3) (a) (842 SE2d 837) (2020).

During the *Jackson-Denno* hearing, the State presented the testimony of the detectives who interviewed Griffin. The State also tendered the video recording of the custodial interview, which the trial court reviewed. The detectives testified that they held Griffin in an interview room for almost an hour before questioning him because they spoke with Richard first. During that time, Griffin turned off the lights in the interview room and stretched out on the floor to nap. When Griffin was asked to get up, turn on the lights, and sit in the chair, he complied without stumbling or losing his

balance. At one point, Griffin put his feet up on the table and leaned back, balancing the chair on two legs.

Griffin's custodial interview commenced at 3:00 a.m., about three hours after the police responded to Richard's 911 call. The detectives testified that, once the interview began, Griffin responded directly and promptly to their questions and appeared to understand where he was, what he was doing, and that the interview was being recorded. One of the detectives read Griffin his *Miranda* rights and handed him a printed waiver of rights form for him to sign. Griffin picked up the form, read it, and commented that "he had always learned not to ever sign anything before he read it." After he signed the waiver form, Griffin told the detectives that he and Cheeley got into an argument, that Cheeley attacked him, and that he stabbed Cheeley with a kitchen knife in the course of defending himself. Griffin did not request counsel, invoke his right to remain silent, or ask to stop the interview. Although one of the detectives smelled the odor of an alcoholic beverage on Griffin's breath, he thought that Griffin was "functional," and that his communication was clear and

intelligent. The detectives testified that Griffin's answers were responsive to the questions posed and that he never "went off on a tangent[.]"

After reviewing the video-recorded interview, the trial court concluded that, even though Griffin had consumed alcohol, he appeared in command of his faculties and was able to intelligently participate in the interview. The trial court saw "no manifestations of impairment to the extent that [Griffin] was unable to read or understand where he was and what he was doing." Further, the trial court found that Griffin was informed of his *Miranda* rights and that he read and signed the waiver of rights form without any apparent problem. The court also found that the detectives had not extended any hope of benefit or made any threats that would render the statement involuntary. Therefore, the court concluded that the statement had been freely and voluntarily made and was admissible at trial.

Considering the totality of the circumstances surrounding Griffin's custodial statement, including the detectives' testimony

concerning Griffin's demeanor, conduct, and responses to their questions during the interview, as well as our de novo review of the video recording of the interview, we conclude that the trial court did not err in finding that Griffin's statement was voluntarily made.

5. Griffin contends that the trial court erred in denying his request to cross-examine Richard, who testified about Cheeley's character trait for peacefulness, with evidence of Cheeley's 1992 felony conviction for robbery by intimidation. For the reasons that follow, we find this claim of error to be without merit.

During the presentation of the State's case, the prosecutor asked Richard if he held an opinion about whether Cheeley was a peaceful person, and defense counsel did not object. Richard responded: "[Cheeley] would try to be. I do know that he had a history of an arrest record [at] some point or [of] some type. What it was or anything like that, I was never aware of. For as long as I've known him, he was never aggressive towards me." Before defense counsel cross-examined Richard, he asked the trial court, outside the presence of the jury, for direction concerning the extent to which

he could test Richard's opinion that Cheeley had a peaceful character by asking Richard if he was aware of Cheeley's criminal history.[7] The trial court allowed defense counsel to cross-examine Richard with questions about Cheeley's prior "arrests" and "charges." The court also informed defense counsel that Griffin was not entitled to introduce into evidence the certified copy of Cheeley's 1992 conviction for robbery by intimidation because Griffin had not yet demonstrated a basis for its admission, and defense counsel agreed.[8]

Defense counsel then cross-examined Richard at length concerning the two armed robbery charges that had been brought against Cheeley. Richard repeatedly responded that the charges

---

[7] Prior to trial, Griffin filed a notice of intent to introduce evidence that Cheeley had committed violent acts, including that he had been arrested for and charged with armed robbery in 1992 and again in 2007. It does not appear from the record before us that either Griffin or the State sought a pretrial ruling from the trial court on whether these prior acts were admissible at trial for any particular purpose.

[8] Defense counsel also agreed that the trial court should give a limiting instruction prior to the cross-examination of Richard's opinion testimony. The court charged: "Members of the jury, you will hear questions regarding prior criminal charges against the alleged victim in this case. You may consider these questions and the answers thereto only insofar as it may relate to attacking the credibility of the witness and not for any other purpose."

would not change his opinion about Cheeley's character trait for peacefulness, at one point explaining: "I don't tend to judge people by what they've done before. I tend to judge them from who I know them to be." When counsel followed up with: "And it wouldn't matter that on each occurrence a person was pistol whipped and struck with a handgun at each of those events?" Richard responded: "I don't know. You say he was charged with it. You didn't say he was convicted." Defense counsel approached the bench and sought permission to ask Richard whether the fact that Cheeley had pleaded guilty in 1992 to the lesser offense of robbery by intimidation would change his opinion.[9] The court denied this request, ruling that defense counsel had adequately cross-examined Richard's credibility and the basis of his opinion of Cheeley's character trait for peacefulness.

Griffin contends the court's ruling improperly curtailed his

---

[9] Defense counsel did not seek to admit into evidence the certified records of Cheeley's 1992 conviction. Further, counsel did not seek to question Richard further about the 2007 armed robbery because that indictment had been dead-docketed.

cross-examination and left the jury with the impression that the defense was "bluffing" about Cheeley's criminal past. He also argues that he should have been able to cross-examine Richard with evidence of Cheeley's 1992 conviction because that conviction was admissible to prove Cheeley's character trait for violence and to show that Griffin was aware of Cheeley's violent nature and, therefore, that he reasonably believed that deadly force was required to prevent Cheeley from seriously injuring or killing him.[10] Given the circumstances of this case, we disagree.

(a) Griffin contends that the trial court erred in denying his request to further test Richard's credibility by inquiring whether it would change Richard's opinion of Cheeley's peaceful nature if Richard learned that Cheeley had pleaded guilty to the lesser offense of robbery by intimidation in connection with the 1992 armed robbery charge. "Like most questions about the admissibility of

---

[10] Griffin did not argue in the trial court during his cross-examination of Richard that Cheeley's 1992 conviction was admissible in evidence to prove Cheeley's character trait for violence or to show that Griffin was aware of Cheeley's violent nature. He raised these arguments for the first time in his motion for a new trial.

evidence, the scope of cross-examination is committed in the first instance to the sound discretion of the trial court, and we review a limitation of cross-examination only for an abuse of that discretion." (Citation omitted.) *Lucas v. State*, 303 Ga. 134, 137 (2) (810 SE2d 491) (2018).

OCGA § 24-4-405 (c) ("Rule 405 (c)") provides that, "[o]n cross-examination [regarding character evidence], inquiry shall be allowable into relevant specific instances of conduct."[11] Assuming without deciding that Griffin's inquiry would have been permitted under Rule 405 (c), it was not an abuse of discretion to disallow it under these circumstances. The record shows that the trial court

---

[11] OCGA § 24-4-405 provides in full:
    (a) In all proceedings in which evidence of character or a trait of character of a person is admissible, proof shall be made by testimony as to reputation or by testimony in the form of an opinion.
    (b) In proceedings in which character or a trait of character of a person is an essential element of a charge, claim, or defense or when an accused testifies to his or her own character, proof may also be made of specific instances of that person's conduct. The character of the accused, including specific instances of the accused's conduct, shall also be admissible in a presentencing hearing subject to the provisions of Code Section 17-10-2.
    (c) On cross-examination, inquiry shall be allowable into relevant specific instances of conduct.

had already afforded Griffin wide latitude to cross-examine Richard by asking him about the details of the two armed robbery charges that had been brought against Cheeley and, consequently, the court saw no reason for Griffin to further test the basis for Richard's opinion.

OCGA § 24-6-611 (b) provides, in relevant part, that "[a] witness may be cross-examined on any matter relevant to any issue in the proceeding. The right of a thorough and sifting cross-examination shall belong to every party as to the witnesses called against the party." This right, however, is not without limits. As we have explained, "[t]rial courts retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, interrogation that is only marginally relevant." (Citations and punctuation omitted.) *Lucas*, 303 Ga. at 137 (2). The transcript shows that, given the questions posed by Griffin, the jury had sufficient information to make a discriminating appraisal of Richard's credibility and the basis for his opinion of Cheeley's character trait for peacefulness. On the record in this case, we

cannot say that the trial court abused its discretion when it disallowed Griffin's cross-examination concerning Cheeley's 1992 conviction for robbery by intimidation. See id.

(b) Griffin also contends that Cheeley's 1992 conviction for robbery by intimidation was admissible pursuant to OCGA § 24-4-404 ("Rule 404") to prove Cheeley's "role as [the] initial aggressor" and to show that Griffin had knowledge of Cheeley's violent nature. Although Rule 404 (a) (2)[12] allows a defendant to offer evidence of a victim's violent character when that trait of character is pertinent

---

[12] OCGA § 24-4-404 (a) provides in full:

(a) Evidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion, except for:

(1) Evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same; or if evidence of a trait of character of the alleged victim of the crime is offered by an accused and admitted under paragraph (2) of this subsection, evidence of the same trait of character of the accused offered by the prosecution;

(2) Subject to the limitations imposed by Code Section 24-4-412, evidence of a pertinent trait of character of the alleged victim of the crime offered by an accused or by the prosecution to rebut the same; or evidence of a character trait of peacefulness of the alleged victim offered by the prosecution in a homicide case to rebut evidence that the alleged victim was the first aggressor[.]

(3) Evidence of the character of a witness, as provided in Code Sections 24-6-607, 24-6-608, and 24-6-609.

to the defendant's claim of self-defense, Griffin did not seek to introduce character evidence for that purpose, nor had he sought a ruling on the admissibility of Cheeley's 1992 conviction for that purpose before or during his cross-examination of Richard. Moreover, Griffin did not make these arguments when he asked the court for permission to cross-examine Richard's opinion of Cheeley's character trait for peacefulness with evidence of Cheeley's 1992 conviction. Consequently, we review these claims only for plain error. See *Bozzie*, 302 Ga. at 707 (2).

Griffin acknowledges that Rule 405 (a) provides that, "[i]n all proceedings in which evidence of character or a trait of character of a person is admissible, proof shall be made by testimony as to reputation or by testimony in the form of an opinion." He argues, however, that Rule 405 (b) authorized him to prove the victim's character with specific instances of conduct because Cheeley's "character was an essential element of the defense of justification because [Griffin] had knowledge of [Cheeley's] violent nature."

Under Rule 404 (a) (1) and (2), evidence of a

"pertinent trait of character" of the defendant or of the alleged victim is admissible when offered by the defendant or by the State in rebuttal.[13] OCGA § 24-4-404 (a) (1), (2). However, under OCGA § 24-4-405 . . ., such character traits generally may be proved only with "testimony as to reputation or testimony in the form of an opinion," OCGA § 24-4-405 (a), although Rule 405 (b) provides an exception to this rule: a character trait may be proved by specific instances of the person's conduct when the character trait "is an essential element of a charge, claim, or defense or when an accused testifies to his or her own character," OCGA § 24-4-405 (b).

*Strong v. State*, __ Ga. __, __ (3) (845 SE2d 653) (2020).

First, Griffin has provided no record citation in support of his contention that he was aware of Cheeley's alleged character trait for violence.[14] Second, a victim's violent character is not an essential element of a self-defense claim. As this Court recently explained:

Under Rule 405, . . . [the victim's] character trait could be proved only with reputation and opinion testimony, because a victim's violent character is not an

---

[13] It appears from the record that the State offered evidence of Cheeley's character trait for peacefulness to rebut Griffin's claim that Cheeley was the first aggressor. See OCGA § 24-4-404 (a) (2). Griffin did not object when the State offered this evidence, and he has not argued in his appellate brief that the trial court erred in admitting this evidence.

[14] "Although this Court has not yet decided whether, under the current Evidence Code, a victim's specific acts of violence of which the defendant had personal knowledge may be admissible to show the defendant's state of mind with respect to a claim of self-defense, we have repeatedly noted that possibility." (Citations omitted.) *Strong*, ___ Ga. at ___ (3), n. 22.

*essential element* of a self-defense claim. See *United States v. Gulley*, 526 F3d 809, 819 (5th Cir. 2008) (pointing out that "a self defense claim may be proven regardless of whether the victim has a violent or passive character," and collecting federal cases on this issue). See also *Mohamud v. State*, 297 Ga. 532, 536 (773 SE2d 755) (2015); Ronald L. Carlson & Michael Scott Carlson, Carlson on Evidence 128 (6th ed. 2018).

(Footnote omitted.) *Strong*, ___ Ga. at ___ (3).

Third and finally, although Rule 405 (c) authorized Griffin to cross-examine Richard's opinion testimony by *inquiring* whether he was aware of relevant specific acts of Cheeley's conduct, it did not require the admission of extrinsic evidence *proving* those acts. See OCGA § 24-4-405 (c) ("On cross-examination, *inquiry* shall be allowable into relevant specific instances of conduct." (emphasis added)). See also *United States v. De Carty*, 300 Fed. Appx. 820, 827 (II) (B) (11th Cir. 2008) [15] ("A party cross-examining a character

---

[15] Many provisions of our Evidence Code, including Rules 404 and 405, closely track "the Federal Rules of Evidence, and when we consider the meaning of these provisions, we look to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit." (Citation and punctuation omitted.) *Timmons v. State*, 302 Ga. 464, 467 (2) (a) (807 SE2d 363) (2017). See generally *State v. Almanza*, 304 Ga. 553, 555-559 (820 SE2d 1) (2018).

witness may ask that witness about a specific act committed by the subject of her testimony because the inquiry is not directed toward proving the conduct of the subject but rather toward evaluating the credibility of the character witness."); *United States v. Adair*, 951 F2d 316, 319 (11th Cir. 1992) ("It is well settled that once a witness has testified about a defendant's good character, cross-examination inquiry is allowed as to whether the reputation witness has *heard* of particular instances of conduct relevant to the trait in question." (citations omitted; emphasis added)). Thus, Griffin has failed to show error – much less plain error – in the court's exclusion of this evidence.

*Judgment affirmed. All the Justices concur, except Warren, J., not participating.*

Decided September 28, 2020.

Murder. Forsyth Superior Court. Before Judge. Dickinson.

*Clark & Towne, David E. Clark, Jessica R. Towne*, for appellant.

*Penny A. Penn, District Attorney, Michael S. Mahoney, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General*, for appellee.