313 Ga. 701
FINAL COPY

S22A0031.  McNABB v. THE STATE.

BETHEL, Justice.

A Newton County jury found Christopher McNabb guilty of malice murder and other offenses in connection with the death of his infant daughter, Caliyah McNabb. Following the denial of his motion for new trial, McNabb appeals, arguing that the evidence presented at trial was insufficient to support his convictions and that his trial counsel provided ineffective assistance by failing to object to evidence of his drug use, incidents of physical abuse, and his relationship to Cortney Bell, Caliyah's mother. We affirm.[1]

---

[1] The crimes occurred on October 7, 2017. On January 23, 2018, a Newton County grand jury indicted McNabb for malice murder (Count 1), two counts of felony murder (Counts 2 and 3), second-degree murder (Count 4), aggravated battery (Count 5), first-degree cruelty to children (Count 6), second-degree cruelty to children (Count 7), and concealing the death of another (Count 8), each in regard to Caliyah. Bell was separately indicted for second-degree murder, second-degree cruelty to children, and contributing to the deprivation of a minor. Prior to trial, the State moved to join McNabb's case with Bell's case. Following a hearing, the trial court granted the State's motion.

At a joint jury trial held from May 7 to 14, 2019, the jury found McNabb guilty of all counts against him. The trial court sentenced McNabb to serve life

1. (a) Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. In September 2017, McNabb and Bell lived with their two-year-old daughter, C. M., in a mobile home in Newton County near Henderson Mill Road and Highway 36.

On September 23, 2017, Bell gave birth to Caliyah in a local hospital. Caliyah remained in the hospital for four days and was released on September 27. After Caliyah was brought home from the hospital, Caliyah and C. M. stayed several days with Bell's cousin,

---

in prison without the possibility of parole on Count 1 and a consecutive term of ten years in prison on Count 8. Counts 2 and 3 were vacated by operation of law, and the remaining counts merged with Count 1. The State has not challenged this purported merger, and we decline to address it sua sponte. See *Dixon v. State*, 302 Ga. 691, 696-698 (4) (808 SE2d 696) (2017).

Bell was also found guilty of the counts against her. The Court of Appeals reversed Bell's convictions for second-degree murder and second-degree cruelty to children, determining that the evidence presented as to those counts was insufficient, but affirmed her conviction for contributing to the deprivation of a minor. See *Bell v. State*, 362 Ga. App. 687 (870 SE2d 20) (2022). Bell's case is not part of this appeal.

Through trial counsel, McNabb filed a motion for new trial on May 21, 2019, which he amended through new counsel on November 22, 2019, and February 17, 2020. The trial court held a hearing on the motion, as amended, on March 23, 2021, and denied the motion on April 1, 2021. McNabb filed a notice of appeal on April 20, 2021. His case was docketed to this Court's April 2022 term and submitted for a decision on the briefs.

2

Megan Sorrells. When the burden of caring for Caliyah, C. M., and her own children became unsustainable for Sorrells, Bell's father, Tim Bell, picked up C. M. and Caliyah and cared for them in his home.[2] Tim brought C. M. and Caliyah back to McNabb andBell on October 6. Tim testified that Caliyah was "healthy," "fed," and "clean" and had no injuries when he left her with McNabb and Bell.

Craig Weatherford, Bell's cousin, came to McNabb and Bell's home later that night, and he and McNabb used methamphetamine together. Craig saw Caliyah while he was there, and he testified that she "looked fine" and was "sleeping good" in a bassinet in the bedroom.

Around 5:00 a.m. on October 7, Bell went to sleep on a couch in the living room after being up with Caliyah much of the night. At

---

[2] Tim's actions resulted in a dispute with McNabb and Bell after Tim brought C. M. and Caliyah to his house. That afternoon, Tim called 911 to report that the children had been "abandoned," and Bell later called 911 to report that Tim had taken Caliyah and C. M. Sorrells and others testified that Bell regularly had bruises from incidents of domestic abuse by McNabb and had a black eye the day Tim took the children home with him.

5:51 a.m., McNabb added a profile picture to his Facebook account.[3]

McNabb's friend, Shane Kidd, testified that, at 7:41 a.m., McNabb texted him saying that he was "wigging and tripping" and needed to get out of the home.[4] Kidd testified that, about an hour later, McNabb sent him another message saying he "couldn't find the baby."

At some point, McNabb joined Bell on the couch and went to sleep. Around 10:00 a.m., C. M. woke McNabb and Bell and told them that Caliyah was gone.[5] Bell called her father, her aunt, and her friend, Melissa Davis, to ask if Caliyah was with them. Davis walked to McNabb and Bell's home a few minutes later and saw McNabb standing on the porch. According to Davis, McNabb

---

[3] The record also shows that, beginning around 10:30 p.m. on October 6 and ending at 9:42 a.m. the following day, McNabb exchanged a series of messages with a woman he met online, Courtney Morris, over Facebook Messenger. At 9:44 a.m., McNabb tried to call Morris, but she did not answer.

[4] Kidd testified that he and McNabb were together and used drugs several times between the time Caliyah came home from the hospital and the day she was reported missing. Kidd explained that "wigging and tripping" meant that McNabb was paranoid from using methamphetamine.

[5] Two crime scene investigators testified that the couch where McNabb and Bell were sleeping was near two doors that led outside, and that those were the only ways in and out of the home.

repeatedly said, "They're going to think I did this." Davis told him to "calm down" but felt something "wasn't right." Bell was calling out for Caliyah and told Davis that she thought her grandparents might have taken Caliyah. At 10:39 a.m., Bell called 911 and reported that Caliyah was missing. Bell said that the last time she had seen Caliyah was around 5:00 that morning. Davis then saw McNabb leave the home and noted that he was not carrying anything when he left.

Several officers arrived on the scene a few minutes later and met Bell. Bell told the officers that Caliyah was missing and that she had last seen her at approximately 5:00 a.m. Bell said McNabb told her that he received a text from his father at 9:30 a.m. and that, at the time, both children were "okay." Bell stated that a little before 10:30 a.m., C. M. woke her and McNabb, saying that Caliyah was gone. Bell said McNabb had left and was walking toward Highway 36 to look for Caliyah.

The owner of the mobile home park and officers at the scene noted that there was no sign of forced entry to the home, including

5

with regard to a window near Caliyah's bassinet in the master bedroom. There was also no blood or any other signs of trauma in the bedroom or elsewhere in the home. One officer testified that Bell was "adamant" that she did not suspect that anybody would come into the home to take Caliyah. A crime scene investigator testified that, given the lack of signs of forced entry on the doors and window of the home, it did not appear to be plausible that someone had broken into the home and kidnapped Caliyah.

About half an hour after the officers arrived, McNabb approached the home from the direction of Highway 36. It was raining at the time. According to those who saw him, McNabb was sweaty, wet, and muddy, and had "green stuff" on him that suggested he might be coming from the woods. He also appeared fidgety, "shady," and "extremely nervous."

McNabb showed one of the officers where he had been in the woods looking for Caliyah but never explained why he was looking for her there. An officer noted that McNabb had a flashlight, which McNabb claimed to have been using to find Caliyah. The officer

6

noted that the sun had been up since around 7:40 a.m. that day.

A few minutes later, Investigator Jeff Alexander arrived on the scene and spoke with McNabb and Bell inside the home. Investigator Alexander then directed a search for Caliyah in the wooded area where McNabb told deputies he had traveled. He testified that he found it "very odd" that McNabb had gone to search for her there.[6]

McNabb and Bell were taken to the Newton County Sheriff's Office for questioning.[7] McNabb was given *Miranda* warnings[8]

---

[6] Investigator Alexander testified that the sheriff's office would not have focused its search in the woods had officers not learned that McNabb had gone there. Another investigator, Wade Freeman, also assisted in the investigation and learned that there were several "theories" about where Caliyah might be, including that McNabb's father, Bell's grandparents, or a neighbor of McNabb and Bell's might have taken Caliyah. Investigator Freeman found no indication that any of those leads was viable.

During his testimony, Craig denied that he broke into McNabb and Bell's home and kidnapped and killed Caliyah. Tim also testified that he did not go to the mobile home on the night of October 6 or the morning of October 7 to take Caliyah from McNabb and Bell and that he would not have done that without calling to get permission.

[7] According to Investigator Alexander, neither McNabb nor Bell was under arrest at the time, and the purpose of the interviews was to quickly gather information about the timeline of Caliyah's disappearance. Investigator Alexander said that, at the time, they were considered "persons of interest."

[8] See *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

7

before being interviewed. In the interview, McNabb described his relationship with Bell's family, some incidents earlier in the week involving the children and Tim, and the time he had spent caring for and feeding Caliyah. He told Investigator Alexander that he fed Caliyah between 3:30 and 5:00 a.m. on October 7 and then went to sleep. He said that he woke up at about 9:30 a.m. when his father texted him and that both girls were asleep in the bedroom at that time. McNabb then went back to sleep but was later awoken by C. M., who was crying. He then discovered that Caliyah was not in the house. After helping Bell search for Caliyah in the home, he left and started looking for her in the woods. McNabb mentioned that a man named Matt Lester might want to retaliate against him.[9]

Investigator Alexander testified that McNabb's timeline, particularly his statements about Caliyah being fine at 9:30 and

---

[9] Other testimony showed that, on September 13, 2017, Kidd and Lester went to McNabb and Bell's mobile home to play video games and smoke methamphetamine. Lester testified that, while he was there, McNabb and another man jumped on him and punched and kicked him. Lester then ran out of the home. Lester testified that he never broke into McNabb and Bell's home and that he never went there after the day McNabb attacked him. Kidd testified that McNabb had no "enemies" who would have broken into his home and kidnapped and killed Caliyah.

then missing by 10:30, indicated that it was not a "feasible scenario" that Lester had come into the home and abducted Caliyah. Investigator Alexander also found it illogical that someone would retaliate against a person's child when the person was asleep on a couch nearby. Investigator Alexander also testified that Tim was ruled out as a suspect "right away" and that there was no evidence that McNabb or Bell had significant assets that would make them a target of a ransom demand. The State also introduced evidence that, at the time of the crimes, Lester was in jail.

Investigator Alexander testified that McNabb's statements about the amount of time he had spent with Caliyah since her birth could not be reconciled with other information he had received about how little McNabb had seen her and how much time Caliyah had spent with other family members. Investigator Alexander testified that, during the interview, McNabb did not ask any questions about the efforts being made to locate Caliyah. Both McNabb and Bell were released and escorted home by deputies after the interviews

9

concluded.[10]

The search for Caliyah continued that afternoon and evening. A perimeter was set up for the wooded area around the mobile home park, and K-9 units were brought out to the scene. The dogs were allowed to sniff some of Caliyah's clothing and then tracked through a trail in the woods and across Henderson Mill Road into an area where logging had been taking place. The dogs were not able to locate Caliyah in that search. Around 9:00 p.m., the search was suspended for the evening.

On the morning of October 8, McNabb and Bell were with Pam Hamby, who is Bell's mother and McNabb's aunt, preparing to appear on television.[11] The search for Caliyah had resumed at that

---

[10] Bell was interviewed by law enforcement officers on October 7 and two other times thereafter. Audio and video recordings of each interview were played for the jury. Each time, the jury was instructed that the out-of-court statements could only be considered against the defendant who made them. The State also introduced two audio recordings of calls McNabb made to Bell while he was in jail. In those calls, Bell asked McNabb repeatedly whether he had been involved in Caliyah's death, which he denied.

[11] McNabb and Bell are first cousins (Hamby is the sister of McNabb's father). The State prepared a diagram showing the family relationships between McNabb, Bell, Hamby, and other witnesses, many of whom were related to them. The State referenced that diagram in its opening statement and twice during witness testimony.

point. A neighbor who had joined the search came across a log that was sitting over a hole in the ground that looked "unusual" and "out of place." Under the log, there was a pile of twigs and sticks. The neighbor saw a black string, and when she pulled on it she saw a blue Nike drawstring bag. She asked someone with her to alert the police.

At the time, Deputy Timothy Dickerson was participating in the search near Henderson Mill Road, and he went to where the bag had been located. The bag appeared to be wet from the recent rain, but Deputy Dickerson did not think the bag appeared to have been there "very long."

Investigator Mickey Kitchens arrived on the scene a few minutes later, and he and Deputy Dickerson opened the bag. They removed several articles of men's clothing from the bag, which were later determined to belong to McNabb. Deputy Dickerson and Investigator Kitchens then saw the top of an infant child's head and ear beneath a blanket. The child, who was later identified as

Caliyah, was dead.[12]

Kim Weatherford, Bell's aunt, learned from her husband that Caliyah's body had been found, and she called Bell to tell her. At the time, Bell was in a vehicle with McNabb, Hamby, and two other people; they were returning to McNabb and Bell's home for an interview with the media.

After Kim told Bell that Caliyah had been found, Hamby told McNabb to "run." Hamby testified that she told McNabb to get out of the car because she worried that people would believe he killed Caliyah. McNabb said he was worried that if Caliyah was found near their home, people would think he and Bell had something to do with it. When the car stopped at a red light, McNabb said, "They are going to think it's me," and "jumped" out of the car.

A few minutes later, Bell, Hamby, and the others arrived at the mobile home park without McNabb. An officer asked Bell if she was

---

[12] The officer who worked with the dog that tracked Caliyah's scent the day she went missing testified that Caliyah's small size, the fact that she would not have walked along the trail (and was instead carried), and the fact that she was wrapped in something would have made it harder for a dog to track her movements.

missing a backpack. Bell replied that McNabb had a bag that she had not seen in a couple days. She described the bag as a Nike drawstring bag that was blue on one side with a red emblem and red on the other side with a blue emblem on it. Bell said McNabb kept the bag with him all the time and carried his clothes in it, but that she had not seen it in a couple of days. Bell told the officer that when she learned that Caliyah had been found, McNabb jumped out of the car and said, "They are going to blame me for it," and ran away.

The officer then issued a lookout for McNabb. Investigator Alexander, who directed the search for McNabb, testified that McNabb's flight "raised the level of suspicion" concerning McNabb because "innocent people don't run."

McNabb entered a gas station on Highway 36 later that afternoon. The cashier testified that McNabb looked "wet and nasty" and that he told her that he had gotten out of the car when he learned Caliyah had been found and that he had been running because the cops were "on his trail." McNabb, who was acting "hyper," told the cashier that he did not "do it." She called 911 and

asked a customer not to leave her alone with McNabb. McNabb told the customer that he had been in the woods for two days.

An officer responded to the 911 call, found McNabb near the gas station, and arrested him. The officer testified that, when he found McNabb, he was "soaking wet," had grass and leaves on his clothes, and appeared to have been in a wooded area.

Following his arrest, McNabb was again advised of his *Miranda* rights and interviewed. In that interview, McNabb said that when Kim called Bell to tell her that Caliyah had been found, Kim repeatedly accused McNabb of killing Caliyah and that he jumped out of the car because he was scared and did not want to go back to his home. He also admitted using methamphetamine the night before Caliyah disappeared but denied that he used his Facebook account after he checked on his daughters at 9:30 a.m.

The medical examiner performed an autopsy on Caliyah the next day. The medical examiner testified that under the blue blanket, Caliyah's body was wrapped in a gray sleeveless adult T-shirt. The blanket had stains on it that appeared to be blood, and

there were leaves and other debris inside the bag in which she had been found, including between her body and the T-shirt.

The medical examiner noted several injuries to Caliyah's face and head, including bruises, multiple fractured bones, an indentation in her skull, and significant brain damage. These injuries were "closed head" injuries that would not have resulted in significant blood spatter. Caliyah had suffered a cut just below her eye that may have been caused by a sharp object. Caliyah also suffered blunt force injuries to her mouth that caused her deciduous teeth to penetrate her gums. The medical examiner testified that these injuries were likely caused by a "huge amount of impact to the head that resulted in all the fractures" and the injuries to Caliyah's mouth. The injuries to Caliyah's cheek and mouth may have resulted in the bleeding observed on the blanket.

The medical examiner determined that all of Caliyah's injuries were suffered contemporaneously and that she would have died "relatively rapidly." She testified that the injuries might have been caused by a series of blows with an object or by a "crushing injury,"

15

such as stomping the head against a hard surface or a large object falling on the head. The medical examiner discounted the possibility that a television or other heavy object had fallen on Caliyah while she was asleep in her bed. She noted that the softness of the bed would have cushioned Caliyah's head against the blow of a falling object and that the type of injuries she suffered were more common when a crushing blow caused the head to be pressed firmly against a hard surface. She also testified that the presence of leaves around Caliyah's body might indicate that she was wrapped in the shirt while she was in a wooded area.

The cause of Caliyah's death was a blunt impact injury to the head, and the manner of death was homicide. Investigator Alexander, who was present for the autopsy, testified that, based on his experience, Caliyah's death was "definitely not" accidental.

On December 13, 2017, McNabb asked to speak with Investigator Alexander. McNabb was brought to an interview room, again given *Miranda* warnings, and interviewed. In that interview, McNabb suggested that Kidd killed Caliyah. He also attributed

16

Caliyah's death to his use of methamphetamine and the people he allowed in his home to use drugs.[13]

Investigator Alexander testified that he followed up on other tips and rumors that were circulating in the community about the crimes, including that Kidd had killed Caliyah. Investigator Alexander testified that he found no truth to any of those rumors and that he had not found anyone with a motive to abduct Caliyah.

(b) McNabb contends that the evidence presented at trial was constitutionally insufficient to sustain his convictions for malice murder and concealing the death of another under *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). McNabb also argues that the evidence, which was entirely circumstantial, did not exclude other reasonable explanations for Caliyah's death. We disagree with both contentions.[14]

---

[13] In this interview, McNabb also admitted that he hit Bell "a week or two" before Caliyah was born, causing the black eye that Sorrells and others observed in the week leading up to Caliyah's death.

[14] McNabb also argues that the evidence was insufficient because the State's case was premised on inadmissible character evidence. We address below McNabb's claims that his trial counsel provided ineffective assistance by

When evaluating the sufficiency of evidence as a matter of federal due process under the Fourteenth Amendment to the United States Constitution, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson*, 443 U. S. at 319 (III) (B). This Court views the evidence in the "light most favorable to the verdict, with deference to the jury's assessment of the weight and credibility of the evidence." (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013).

Further, as a matter of Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. "Not every hypothesis is reasonable, and the evidence does not have to exclude every conceivable inference or

not objecting to such evidence, but those claims do not affect our assessment of the sufficiency of the evidence. When we consider the legal sufficiency of the evidence, we consider all the evidence presented at trial without regard to whether some of that evidence might have been improperly admitted. See *Virger v. State*, 305 Ga. 281, 286 (2) n.3 (824 SE2d 346) (2019).

hypothesis; it need rule out only those that are reasonable." (Citation and punctuation omitted.) *Cochran v. State*, 305 Ga. 827, 829 (1) (828 SE2d 338) (2019). Whether alternative hypotheses are reasonable, however, is usually a question for the jury, and this Court will not disturb the jury's finding unless it is insufficient as a matter of law. See *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019).

OCGA § 16-5-1 (a) provides that "[a] person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (b) provides:

> Express malice is that deliberate intention unlawfully to take the life of another human being which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all the circumstances of the killing show an abandoned and malignant heart.

"The malice necessary to establish malice murder may be formed in an instant, as long as it is present at the time of the killing." *Benton v. State*, 305 Ga. 242, 244 (1) (a) (824 SE2d 322) (2019). It is for the

19

jury to determine from the facts and circumstances presented in evidence whether a killing is malicious. See id.

OCGA § 16-10-31 provides, in relevant part, that "[a] person who, by concealing the death of any other person, hinders a discovery of whether or not such person was unlawfully killed is guilty of a felony." Thus, the State had to prove that McNabb concealed the fact of Caliyah's death, and it had to establish that his doing so delayed or otherwise hindered the discovery that her death was an unlawful one. See *Nazario v. State*, 293 Ga. 480, 491 (3) (d) (746 SE2d 109) (2013) ("As the statutory text indicates, the gravamen of the offense is conduct that hinders 'a discovery' that a person has been unlawfully killed by concealing that death.").

Here, the evidence showed that Caliyah died from blunt force trauma inflicted to her head. On the morning of October 7, McNabb and Bell reported that Caliyah was missing. The next day, her body was located under a tree near McNabb's home wrapped in McNabb's clothes and tucked inside McNabb's bag. See *Collett v. State*, 305 Ga. 853, 855-856 (1) (828 SE2d 362) (2019) (discussing evidence that

body of child victim was found in brush pile behind her home, that she had scratch marks and bruising on her face and neck, and that multiple fibers from appellant's clothing were found on victim's clothing as circumstantial evidence of appellant's guilt). The jury was also presented with evidence of McNabb's drug use and its effect on his behavior, that he was the last person to see Caliyah before she was reported missing, and that he behaved bizarrely and suspiciously after Caliyah was reported missing. See *Bennett v. State*, 301 Ga. 874, 877-878 (1) (804 SE2d 360) (2017) (discussing evidence of appellant's "almost daily" drug use that could result in violent behavior, that he was alone with the victim just before her death, that he presented multiple explanations for how he likely caused some of her prior injuries, as well as his behavior after emergency personnel arrived as circumstantial evidence that appellant killed the victim). McNabb later fled and concealed himself in the woods when he learned Caliyah had been found. See *Rowland v. State*, 306 Ga. 59, 65 (3) n.4 (829 SE2d 81) (2019) (Evidence of "flight . . . and related conduct is admissible as evidence

of consciousness of guilt, and thus of guilt itself." (citation and punctuation omitted)). The State also presented testimony that there was no evidence connecting anyone besides McNabb to Caliyah's death, that other leads and rumors had proven fruitless, and that McNabb's suggestion that Lester kidnapped and killed Caliyah as an act of revenge was impossible, given that Lester was in jail at the time the crimes were committed.

Despite this evidence, McNabb argues that his convictions should be overturned because the State failed to produce any direct evidence that he caused Caliyah's death. Specifically, McNabb argues that the evidence was insufficient because, although the autopsy revealed that Caliyah died from a blunt force injury to her head, the medical examiner was not able to determine what caused the impact, how many times Caliyah was struck in the head, or where the injuries were inflicted.

However, although there was no direct evidence of premeditation or the exact manner in which Caliyah was killed, the evidence presented authorized the jury to determine that the

circumstances of Caliyah's killing show an abandoned and malignant heart and that McNabb was the person who inflicted her injuries. See *McKinney v. State*, 300 Ga. 562, 566-567 (2) (797 SE2d 484) (2017) ("Although no witnesses observed [the victim's] death and the medical examiner could not identify the exact cause of death, there was sufficient evidence to conclude that she was murdered" where evidence showed that she was last seen alive in good health and her body was found hidden in the woods.); *Walker v. State*, 296 Ga. 161, 163-164 (1) (a) (766 SE2d 28) (2014) ("Although the medical examiner may have been unable to explain the precise mechanism by which [the victim] was asphyxiated, the State nevertheless offered evidence sufficient to prove that [the appellant] was the cause of her asphyxiation and that he caused her death unlawfully and with malice."). The evidence also authorized the jury to determine that, after the injuries were inflicted, McNabb concealed Caliyah's body in such a way that her discovery was hindered. See *Edenfield v. State*, 293 Ga. 370, 371-373 (1) (744 SE2d 738) (2013) (evidence sufficient to support conviction for concealing

the death of another where victim was found in a wooded area wrapped in plastic bags), disapproved on other grounds by *Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820 SE2d 640) (2018).

Thus, viewed in the light most favorable to the verdicts, the evidence presented at trial supports the jury's guilty verdicts on the counts of malice murder and concealing the death of another. Moreover, the evidence authorized the jury to determine that the proved facts were not only consistent with McNabb's guilt but that they excluded every other reasonable hypothesis as to who committed the crimes. Thus, when viewed as a whole, the evidence presented at trial was sufficient to support McNabb's convictions for malice murder and concealing the death of another as a matter of due process and under OCGA § 24-14-6.

2. McNabb also contends that his trial counsel provided constitutionally ineffective assistance by failing to object to evidence of McNabb's drug use, evidence that McNabb physically abused Bell, and evidence that McNabb and Bell are first cousins. McNabb argues that this evidence was irrelevant, constituted inadmissible

character evidence, and was introduced solely to cast him in a bad light.

> To prevail on these claims, McNabb
>
> has the burden of proving both that the performance of his lawyer was professionally deficient and that he was prejudiced as a result. To prove deficient performance, [McNabb] must show that his trial counsel acted or failed to act in an objectively unreasonable way, considering all of the circumstances and in light of prevailing professional norms. To prove resulting prejudice, [McNabb] must show a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. In examining an ineffectiveness claim, a court need not address both components of the inquiry if the defendant makes an insufficient showing on one.

(Citations and punctuation omitted.) *Stuckey v. State*, 301 Ga. 767, 771 (2) (804 SE2d 76) (2017) (citing *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). "A strong presumption exists that counsel's conduct falls within the broad range of professional conduct." (Citation and punctuation omitted.) *Ford v. State*, 298 Ga. 560, 566 (8) (783 SE2d 906) (2016).

(a) McNabb first argues that his trial counsel performed deficiently by failing to object to evidence of his drug use and that

he physically abused Bell. We disagree.

Trial counsel filed a motion in limine to exclude, among other evidence, evidence of McNabb's drug use and alleged acts of abuse against Bell. Counsel testified at the hearing on McNabb's motion for new trial, and the record of the pre-trial hearing on McNabb's motion in limine reflects, that he agreed with the prosecutor that McNabb's drug use during the two weeks from the time Caliyah was born until her death could be admitted at trial. Counsel testified that such evidence was "probably going to be admissible for purposes of showing [McNabb's] state [of] mind and other admissible reasons other than just his character or his use of drugs." Counsel further testified that McNabb had used methamphetamine for several years and that counsel made an agreement with the prosecutor that narrowed down the evidence the State would seek to admit to just the two-week period leading up to Caliyah's death, when the evidence suggested that methamphetamine use affected McNabb's ability to care for Caliyah and his behavior generally. The agreement also limited the prosecutor's discussion of abuse of Bell

26

by McNabb to incidents occurring in the two weeks leading up to Caliyah's death. In light of this agreement, the trial court did not rule on the portion of McNabb's motion in limine relating to evidence of drug use and denied McNabb's motion as to evidence of domestic abuse between McNabb and Bell.

Trial counsel testified that he believed he had a better chance to convince the prosecutor that certain evidence should be excluded than he would have with the trial court and that the process he used was more efficient. Counsel referred to the agreement as "strategically significant" and "a strategic victory for reducing the amount of really bad things that could have come in" and testified that he was "very happy" with the outcome of the meetings. Counsel testified that, had he not believed that his discussions with the prosecutor had been helpful to McNabb, he would have taken his specific objections back before the trial court. Counsel also testified that he consciously decided not to make some objections at trial in order to avoid highlighting specific testimony for the jury.

The record also showed that McNabb's trial counsel referred to

McNabb's drug use in his opening statement and closing argument. Counsel did so in the context of arguing to the jury that McNabb's drug use and his heavily tattooed appearance were reasons he became the prime suspect in the case.

As we have discussed, "[r]easonable trial strategy and tactics do not amount to ineffective assistance of counsel." (Citation and punctuation omitted.) *Griffin v. State*, 309 Ga. 860, 866 (3) (849 SE2d 191) (2020). "[M]erely arguing that there is another, or even a better, way for counsel to have performed" is not enough. (Citation and punctuation omitted.) Id. at 867 (3). "The mere fact that present counsel would have pursued a different strategy does not render trial counsel's strategy unreasonable." (Citation and punctuation omitted.) *Stanley v. State*, 283 Ga. 36, 41 (2) (c) (656 SE2d 806) (2008).

Here, McNabb has failed to prove that his trial counsel performed deficiently in regard to the evidence of McNabb's drug use and abuse of Bell and the use of that evidence at trial. It is clear that counsel made a strategic choice to pursue an agreement with the

28

prosecutor after initially filing a motion in limine to exclude the evidence at issue. That strategy was not objectively unreasonable, particularly in light of counsel's representation that he would have pressed his objections had he not obtained a favorable outcome with the prosecutor, and it was not unreasonable for trial counsel to believe he received a more favorable outcome in his negotiations with the prosecutor than he might have received by pressing his motion with the trial court, as much of the evidence of drug use and physical abuse could have been admitted as intrinsic evidence of the crimes. See *Harris v. State*, 310 Ga. 372, 377 (2) (b) (850 SE2d 77) (2020) ("Evidence is admissible as intrinsic evidence . . . when it is (1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense." (citation and punctuation omitted)). Moreover, even though some of the evidence indicated that McNabb physically abused Bell before Caliyah's birth and was admitted at trial despite counsel's agreement with the prosecutor, trial counsel

29

testified that he withheld objections to some testimony so as not to highlight damaging information for the jury. This, too, is a matter of trial strategy, and McNabb has not shown that it was objectively unreasonable for his trial counsel not to renew his objection to this particular testimony at trial. See *Walker v. State*, 308 Ga. 33, 39 (3) (a) (838 SE2d 792) (2020) (trial counsel's decision to forgo objections to several statements by witness so as not to give them "validity" or draw "attention" or "focus" to such statements was reasonable trial strategy (punctuation omitted)). This claim of ineffective assistance therefore fails.

(b) McNabb also argues that trial counsel performed deficiently by failing to object to evidence that McNabb and Bell are first cousins on the grounds that this evidence was irrelevant, was inadmissible character evidence, and was more prejudicial than probative. We disagree.

Many of the witnesses who testified at trial were related to McNabb or Bell, or both. The State created a diagram showing the family relationship between those witnesses and the defendants,

which was admitted into evidence. The State used the diagram during its opening statement and twice during witness testimony and also asked several witnesses how they were related to other witnesses, McNabb, and Bell. In addition to identifying how some of the witnesses knew each other and the defendants, the evidence showed that McNabb and Bell are first cousins.

McNabb's trial counsel did not object to this evidence, including the use of the diagram. In denying McNabb's motion for new trial, the trial court determined that the failure to object did not constitute deficient performance because the evidence was admissible and because its probative value in explaining relationships between the witnesses and defendants outweighed any prejudicial impact the evidence might have had, thus satisfying the balancing test under OCGA § 24-4-403 ("Rule 403").[15] We agree with the trial court's determination that trial counsel did not perform deficiently because

---

[15] Rule 403 provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

objections to this evidence on the bases now asserted by McNabb would have been meritless.

(i) First, the evidence of the familial relationships between some of the witnesses, McNabb, and Bell was relevant to the issues in the case, as the trial court implicitly determined in its ruling on McNabb's motion for new trial. "Relevant evidence" is defined as that evidence which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401. "This is a binary question — evidence is either relevant or it is not." (Citation and punctuation omitted.) *Moon v. State*, 312 Ga. 31, 51 (3) (a) (860 SE2d 519) (2021). "The standard for relevant evidence is a liberal one, and such evidence is generally admissible even if it has only slight probative value." (Citation and punctuation omitted.) *McClain v. State*, 303 Ga. 6, 10 (3) (810 SE2d 77) (2018).

Here, the nature of the relationships between the witnesses and defendants was relevant, as the jury's understanding of a

familial relationship between a defendant and a witness could affect the jury's assessment of the witness's credibility or potential bias and provide context for the witness's testimony. Moreover, a "witness's relationship to the parties may always be proved for the consideration of the jury." OCGA § 24-6-622. Therefore, any objection to this evidence as irrelevant would have been futile, and the failure to make such an objection cannot form the basis of a claim of ineffective assistance. See *Matthews v. State*, 311 Ga. 531, 545-546 (4) (a) (858 SE2d 718) (2021).

(ii) Second, McNabb argues that his trial counsel performed deficiently by not objecting to the evidence that he and Bell are first cousins as impermissible character evidence. McNabb argues that an objection under OCGA § 24-4-404 (b) ("Rule 404 (b)") and Rule 403 would have excluded this evidence. We disagree that his trial counsel performed deficiently by failing to make this objection.

Rule 404 (b) provides in relevant part that "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may,

33

however, be admissible for other purposes[.]" However, none of the evidence of the family relationships between McNabb, Bell, and the witnesses to whom they are related was evidence of "other crimes, wrongs, or acts" such that the prohibitions of Rule 404 (b) were implicated by its admission.

Moreover, McNabb has not shown that the evidence would have been excluded under Rule 403 had his trial counsel objected on that basis. Here, in ruling on McNabb's motion for new trial, the trial court determined that the probative value of the evidence of the family relationships outweighed any prejudicial effect and that any objection made by trial counsel on this basis would have been meritless. We agree. See *Olds v. State*, 299 Ga. 65, 70 (2) & n. 7 (786 SE2d 633) (2016) (noting the well-established principles that "[t]he major function of Rule 403 is to exclude matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect" and that "the exclusion of evidence under Rule 403 is an extraordinary remedy which should be used only sparingly" (citations and punctuation omitted)).

In light of the foregoing, any objection to the evidence of the family relationships between McNabb, Bell, and the witnesses to whom they were related under Rules 404 (b) and 403 would have been meritless, and "[t]he failure to make a meritless objection is not deficient performance." *Walker v. State*, 306 Ga. 637, 645 (2) (b) (832 SE2d 783) (2019). Because McNabb has not shown that his trial counsel performed deficiently by failing to make this objection, this claim of ineffective assistance fails.

*Judgment affirmed. All the Justices concur.*

Decided May 17, 2022.

Murder. Newton Superior Court. Before Judge Ott.

*Nichols Law, Titus T. Nichols*, for appellant.

*Randal M. McGinley, District Attorney, Alexandra J. Stone, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Kathleen L. McCanless, Assistant Attorney General*, for appellee.