NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 21, 2026

S25A1365.  DICKERSON v. THE STATE.

LAND, Justice.

John Lorenzo Dickerson was convicted of felony murder and other crimes for the shooting death of Bernie Givens.[1] On appeal,

---

[1] The crimes occurred on October 1, 2016. On December 14, 2016, an Emanuel County grand jury indicted Dickerson, charging him with malice murder (Count 1), felony murder (Count 3), aggravated assault (Count 5), criminal attempt to commit armed robbery (Count 7), and four counts of possession of a firearm during the commission of a felony (Counts 2, 4, 6, and 8).

At a trial from September 25 to 29, 2017, a jury found Dickerson not guilty of Counts 1 and 2 but guilty of the remaining counts. On October 12, 2017, the trial court sentenced Dickerson to serve life in prison without the possibility of parole on Count 3, five years in prison on Count 4, consecutive to Count 3, 30 years in prison on Count 7, concurrent with Count 3, and five years in prison on Count 8, consecutive to Count 7 but concurrent with Count 4. Count 5 was merged with Count 3, and Count 6 was merged with Counts 3 and 4 for sentencing purposes.

Dickerson filed a timely motion for new trial on October 20, 2017, which was amended several times. Following hearings on August 7, 2019, and April 6, 2022, the trial court denied Dickerson's motion for new trial on February 10, 2025.

Dickerson filed a timely notice of appeal on February 14, 2025, and the case was docketed to the August term of this Court and orally argued on November 4, 2025.

Dickerson argues that the trial court erred by admitting extrinsic evidence for the purposes of intent and identity and by giving the jury instructions on flight and witness intimidation. He also argues that his trial counsel rendered constitutionally ineffective assistance by failing to object when the State presented evidence at trial and argued during closing that two of the State's witnesses were intimidated, requesting jury instructions that evidence of witness intimidation and flight could be circumstantial evidence of guilt, failing to object to inadmissible and prejudicial hearsay, and failing to object to irrelevant and highly prejudicial character evidence. Dickerson contends that he was prejudiced by the cumulative effect of these errors and omissions. For the reasons that follow, we affirm.

1. The evidence presented at trial showed as follows. At 3:09 a.m. on October 1, 2016, Givens's girlfriend called 911 and reported that Givens had been shot in their front yard. Givens's girlfriend testified that she was awakened when she "heard the gunshot," and ran outside because Givens called out for help. She pulled Givens – who was still alive and able to assist – towards the house to "get him

to safety." Because her cell phone had no signal, she ran down the street to her neighbor's house to call 911. When Givens's girlfriend returned, she emptied Givens's pockets – which included money, marijuana, a cell phone, and cigarettes – at another neighbor's suggestion and placed the items in a drawer of their bedroom dresser.

Officers responded at 3:14 a.m. They saw a "blood trail from the carport leading up into the side entrance of the house" and found Givens "lifeless" in the kitchen area with one foot "hanging out the door." Givens's girlfriend was attempting to move one of the vehicles in the driveway to make room "for the ambulance to come in," but the officers stopped her when they noticed a "black … .380" Smith & Wesson pistol lying "[i]n front of the SUV on the grass area." The pistol's magazine was filled, and it did not appear to have been recently fired. Officers also noted that, "just behind the trash can in the sandy area it looked … like a scuffle had taken place" based on the different "shoe impressions" in the sand. They collected additional evidence consisting of a 9mm shell casing behind the

3

trash can; a $50 bill, a small plastic bag of cocaine, and a .380-caliber shell casing that did not appear to have been recently fired in the front yard; several cell phones and other narcotics in Givens's truck; and a pink firearm, a bag of marijuana, another cell phone, $1,361 in cash, and cigarettes in the master bedroom.

The medical examiner testified at trial that Givens suffered "three gunshot wound defects," all resulting from a single bullet, which caused him to bleed out within "several minutes." The examiner found "no gunpowder stippling or gunpowder residue or soot on the skin," indicating that the shot was likely fired from more than four feet away.

Earlier that night, a large group of people, including Givens, had attended a block party in Swainsboro. Michael Gardner, Givens's cousin, testified at trial that, at some point during the party, Givens "went down the street and started playing cards" and ended up with "a lot of money." Later, while Givens and Gardner were speaking, Dickerson "walked by [them] … maybe eight or ten times." Each time, Dickerson looked "[k]ind of mad" and had his

4

hand "in his pocket" on what Gardner believed – from the imprint in Dickerson's hoodie – to be a 9mm gun. A few minutes later, Gardner heard a gunshot and Givens said, "I knew [Dickerson] was going to do that s\*\*t, let's leave."

Maurice Pullens, Givens's friend, testified that, prior to the block party, Dickerson told him that he was "trying to get back to Jersey" but that he did not have the money to do so. Later that night, Pullens was standing with Givens as Givens "count[ed] his money." Givens then "noticed that [Dickerson] was checking him out" from "across the road." Pullens recalled that Givens said, loudly enough for Dickerson to hear, "why you looking at me while I'm counting my money."

Though he gave several different stories over the course of the investigation, Shelton Wright testified at trial that he been at the block party that evening with Dickerson, who was showing off his gun and "saying he needed to get some money." Dickerson later admitted to Wright that he was the "one that did it," in reference to Givens's murder. According to Wright, Dickerson said that he and

5

Givens "were tussling and he shot," that Givens "had a gun and he dropped his, and [Dickerson] shot him," and that Lonnell "Lo" Denson was with him.[2] Dickerson claimed that he did it because "he was trying to get back to Jersey."

Darrell McKinney also provided several different versions of events throughout the investigation. At trial, he testified that he had asked Givens for about $50 worth of "dope" and that Givens told him to meet him at Givens's house after the block party. When McKinney got to Givens's house, he pulled into the driveway and talked to Givens for a moment. He testified that "that's when the gunfire came up … it came from the back of the house." He saw a white Buick that "[w]ent up the road … turned around and … came by like slow," stopping two houses up from Givens's house. McKinney saw two people go behind that house, and then Givens was shot from "close up" and started bleeding from his leg. McKinney heard the shooter

---

[2] Denson was interviewed several times by investigators and was eventually arrested in relation to Givens's murder. At the time of this trial, however, the State was still investigating Denson's involvement in the case. Denson did not testify at Dickerson's trial.

say, "I finally got you, motherf**ker." McKinney testified that he recognized Dickerson – who typically drove a "reddish-orange" PT Cruiser-like car – as the shooter and Denson as the man with him.

After Givens was shot, McKinney "jumped in [his] car and [he] threw it in reverse." He then went back to "help [Givens] out" and saw him bleeding profusely from his leg, but he "got scared" and "tore out" when the house door opened. McKinney then went to a convenience store where his cousin worked and told her about the shooting.

Jamaica McCann-Bell – Dickerson's girlfriend – testified that she and Dickerson got home from the block party around 11:00 p.m. She woke up around 3:00 a.m. and saw Dickerson sitting outside. Shortly after, she saw two men speaking with Dickerson. Dickerson came inside and told McCann-Bell that Givens had been killed, and they went to the crime scene where many onlookers had gathered. One onlooker testified at trial that, while she was at the crime scene, Dickerson told her that Givens "didn't get shot in the head; he got shot in the leg."

Later that night, McCann-Bell saw Dickerson take the bullets out of a firearm and then wipe the firearm and its bullets down with bleach. Dickerson told her that "his cousin [Travis Brown] brought him this gun … for protection or whatever."[3] But Dickerson said that he did not "trust it," so he "put it back" in Brown's house next door.[4] McCann-Bell and Dickerson then went to see Dickerson's sister. Dickerson "took all his clothes with him" to his sister's house.

McCann-Bell further testified that, the next day, Dickerson got the oil changed on his "burgundy-reddish" PT Cruiser. He told her that he wanted to leave for New Jersey because "he was receiving threats, calls" and "word got out saying he was the one that was involved" in Givens's murder. McCann-Bell and Dickerson left Swainsboro that night, but they were pulled over during a traffic stop and arrested in New Jersey.

Dickerson's ex-girlfriend testified that, on the night of Givens's murder, Dickerson texted her once and called her four times before

---

[3] Brown testified that he did not give Dickerson a pistol that night.
[4] Investigators searched Brown's house about a month after Givens's murder, but they did not find a gun.

she woke up.[5] She answered his fifth call at 3:11 a.m., and Dickerson said "something just happened … I heard [Givens] just got killed," and "he was shot."

2. Dickerson argues that the trial court abused its discretion in admitting extrinsic evidence from a prior shooting for purposes of intent and identity under OCGA § 24-4-404(b) ("Rule 404(b)").[6] Assuming without deciding that the trial court abused its discretion in admitting the evidence, we conclude that any such error was harmless and does not require reversal.

Prior to trial, the State filed notice of its intent to introduce evidence pursuant to Rule 404(b) that Dickerson had committed aggravated assault against Tyrone Phillips two months prior to Givens's murder. After a hearing, the trial court issued an order

---

[5] Dickerson's cell phone texted "wyd" at 3:07 a.m. and then placed five total calls to two different phone numbers associated with his ex-girlfriend between 3:08 and 3:11 a.m. on October 1, 2016.

[6] Rule 404(b) provides, in relevant part:
Evidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

9

admitting the evidence for purposes of intent and identity.

At trial, an officer testified that, on August 12, 2016, she responded to a call where the victim, Phillips, had a "gunshot wound to his right leg, thigh area." At that time, he would not provide any information to law enforcement about who shot him.

Phillips testified that he was on his way to "buy something to drink" when Dickerson "struck" him. Phillips then "offered to fight" Dickerson but noticed that "he had a pistol in his pocket." As Phillips was walking off, Dickerson followed him and "hit [him] again." Phillips started running, "felt a hit in the back of [his] leg," and knew he had been shot. Phillips testified that Dickerson was "standing up over [Phillips] like he was fixing to finish [him]" but that Phillips de-escalated the situation. Phillips was then taken to the hospital. He testified that he did not cooperate with police because he wanted to "handle it" himself.

A witness to the Phillips shooting testified that she heard a gunshot, came around the corner, and "saw [Phillips] dragging his leg out [in] the middle of the road, and [Dickerson] had a gun pointed

at him." The witness testified that she did not tell police about the incident because Phillips asked her not to.

Dickerson argues that the above testimony was improperly admitted under Rule 404(b) and that he was harmed by the improper evidence. "We review a trial court's evidentiary rulings under an abuse of discretion standard of review … [a]nd even where an abuse of discretion is shown, there are no grounds for reversal if the error did not affect a substantial right, and thus harm, the defendant." *Smith v. State*, ___ Ga. ___ (2025), S25A1131, slip op. at 4 (Ga. Oct. 21, 2025) (cleaned up). And where, as here, "the alleged error is non-constitutional, we examine whether it is highly probable that the error did not contribute to the verdict by reviewing the record de novo and weighing the evidence as we would expect reasonable jurors to have done." Id. at 4–5 (cleaned up). See also *Redding v. State*, 320 Ga. 107, 116 (2024); *Jones v. State*, 315 Ga. 117, 122 (2022). Generally, "we have found Rule 404(b) errors harmless where the properly admitted evidence was so strong that the prejudicial effect of the other-acts evidence had no significant

11

influence on the guilty verdicts." *Nundra v. State*, 316 Ga. 1, 6 (2023) (cleaned up). See also *Stafford v. State*, 312 Ga. 811, 817–18 (2021) ("Given the limited prejudicial effect of the admission of the [prior] incident and the strength of the other evidence of [a]ppellant's guilt, we conclude that it is highly probable that any error in admitting evidence of the [prior] incident did not contribute to the verdicts.").

We first note that the properly admitted evidence of Dickerson's guilt was strong. Pullens testified that Dickerson complained of needing money to go to New Jersey and then watched Givens "count[] his money" at the party. Gardner testified that Dickerson kept "walk[ing] by" him and Givens at the block party, looking "[k]ind of mad." According to Wright, Dickerson said that he "needed to get some money" and that Dickerson later admitted to committing the murder "to get back to Jersey." McKinney provided an eyewitness account identifying Dickerson as the one who shot Givens. Dickerson's ex-girlfriend testified that, minutes after Givens's murder, Dickerson called her and said that "something just happened" and that Givens "was shot." As onlookers gathered at the

12

crime scene, believing at the time that Givens had been shot in the head, Dickerson correctly told one of them that "he didn't get shot in the head; he got shot in the leg." And McCann-Bell attested to Dickerson's actions after the shooting, which included cleaning a gun, packing his things, and leaving for New Jersey.

As to the potential harmful effect of the other-acts evidence, the trial court instructed the jury extensively both before the State presented evidence of the Phillips shooting and again during the final charge that the evidence could be considered only for the limited purposes of showing Dickerson's intent and identity; that the jury could not infer from such evidence that Dickerson is of a character that would commit such crimes; and that Dickerson was on trial for the offenses charged in this case, not for any other acts.

We ordinarily presume that jurors follow their instructions. See *Howell v. State*, 307 Ga. 865, 875 (2020). Because the properly admitted evidence of Dickerson's guilt was strong and the trial court provided proper limiting instructions, we conclude that it is highly probable that any error in admitting the Phillips shooting evidence

13

did not contribute to the jury's guilty verdicts. We therefore reject this claim of error. See *Howell*, 307 Ga. at 875 (holding that any error in the admission of other-acts evidence was harmless in light of the other strong evidence of guilt and the trial court's limiting instructions).

3. Dickerson also argues that the trial court plainly erred when it gave jury instructions on flight and witness intimidation. To show plain error, Dickerson "must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity or public reputation of judicial proceedings." *Holloway v. State*, 320 Ga. 668, 670–71 (2025). "For purposes of plain error review, an affirmative waiver is the intentional relinquishment or abandonment of a known right." Id. at 671. Because Dickerson's trial counsel requested the jury instructions about which he complains on appeal, we conclude that Dickerson intentionally relinquished any claim that the trial court erred by

14

giving these instructions, and this enumeration fails at the first step of plain error review. Id.

4. Dickerson next argues that he was denied the effective assistance of counsel in several respects. For Dickerson to prevail on his ineffective assistance claims, he must prove both deficient performance by his trial counsel and resulting prejudice. See *Strickland v. Washington*, 466 US 668, 687 (1984). To show deficiency, Dickerson must establish that trial counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. Id. at 687–88. The law recognizes a "strong presumption" that counsel performed reasonably, and the defendant bears the burden of overcoming this presumption. Id. at 689.

Even if Dickerson proves that his counsel's performance was deficient in this constitutional sense, he also must prove resulting prejudice to prevail on a claim of ineffective assistance of counsel. To satisfy the prejudice prong, Dickerson must show that, but for his counsel's unprofessional errors, there is a "reasonable probability"

that the outcome of the proceeding would have been different. *Strickland*, 466 US at 694. And "if either *Strickland* prong is not met, this Court need not examine the other prong." *Fraser v. State*, 322 Ga. 544, 547 (2025). We conclude that Dickerson's trial counsel did not render ineffective assistance for the reasons stated below.

(a) Dickerson first argues that his counsel was ineffective for failing to object when the State presented evidence at trial and argued during closing that two of the State's witnesses – McKinney and Wright – were intimidated. We are not persuaded.

At trial, McKinney explained that he had changed his statements to law enforcement because he was "scared" and was "being threatened" about providing his testimony. McKinney testified that he received his first threat shortly after Givens's murder, and then, about four months prior to the trial, Dickerson's sister told McKinney that she was "going to get" him. McKinney further testified that, the Saturday before he was set to testify, Dickerson's sister and her husband "c[a]me through." Dickerson's sister told McKinney that he was a "lying motherf**ker," that he got

Dickerson "locked up for nothing," and that they were "going to get" him. Dickerson's brother-in-law then "showed [McKinney] a gun, and [McKinney] tried to run." The brother-in-law "ran [McKinney] down … picked [him] up … slammed [him] and kicked [him] in [his] back." The brother-in-law also "hit [McKinney] in the face like three or four times" before McKinney "blanked out."[7] McKinney went to the hospital for his injuries.

Wright testified that he was not forthcoming in providing information to law enforcement because he was "[s]cared" to be involved in the case. And an investigator later testified that Wright "called to tell [law enforcement] that a threat was made" against him after he testified, but the threat had not been connected to Dickerson.

In the State's closing argument, the prosecutor argued that "the intimidated witnesses, they came in spades." The prosecutor

---

[7] Dickerson's brother-in-law testified at trial that McKinney was acting aggressively, had "a knife or something," and "scratched [him]," so he "charged [McKinney]." But the brother-in-law said that he "got the worse end of it" and never pulled out a gun. The brother-in-law also testified that Dickerson never asked him to intimidate McKinney.

17

argued that McKinney was "body slammed … because he was coming to tell you what he saw" and that Wright was "frightened" to be in court.

At the motion for new trial hearing, Dickerson's trial counsel testified that he made a tactical decision not to object to the witness intimidation evidence because he was "not that … concerned" about it, was focused on McKinney's credibility "above everything else," and did not think that the fact that McKinney had allegedly been assaulted by Dickerson's sister would have made him look any more credible. And the record reflects counsel's thorough cross-examination of McKinney, during which he attempted to discredit McKinney as the only eyewitness to Givens's murder and to highlight the inconsistencies in his prior statements to law enforcement.

Citing *Wade v. State*, 304 Ga. 5, 12 (2018), Dickerson contends that the witness intimidation evidence was irrelevant and inadmissible because there was no evidence that he was involved in, ordered, or even knew about the threats against McKinney or

18

Wright and that trial counsel's failure to object constituted ineffective assistance. But we have held that a "trial court has discretion to admit evidence of a threat to a witness that is not shown to be connected to the defendant if the evidence is relevant to explain the witness's reluctant conduct on the witness stand or his prior inconsistent statements." See *Bryant v. State*, 296 Ga. 456, 459 (2015). See also *Palmer v. State*, 303 Ga. 810, 817 (2018) ("[E]ven when evidence of a threat to a witness is not connected to the defendant," the trial court still has discretion to admit the evidence "if it is 'relevant to explain the witness's reluctant conduct on the witness stand.'"); *Foster v. State*, 294 Ga. 383, 385–86 (2014) (testimony that a witness had received threats from someone other than the appellant, which the prosecutor did not connect to the appellant, was admissible to explain the witness's reluctance on the stand).

The State presented evidence that McKinney and Wright were hesitant to speak with investigators, provided many different versions of events throughout the investigation, and were reluctant

19

to testify at trial because they had been threatened. But the State did not present evidence showing that the threats made against McKinney and Wright were connected to Dickerson and did not argue that they were circumstantial evidence of his guilt. See *Williams v. State*, 290 Ga. 533, 539 (2012) (evidence of a threatening gesture to a witness, which the State did not connect to the appellant, was admissible "to explain [the witness's] inconsistent statements and reluctance on the witness stand, which occurred both before and after the threat"). Thus, the intimidation evidence was admissible as it was used – to explain why the witnesses were reluctant to testify and to explain their prior inconsistent statements – and any objection would have been meritless. See *Redding v. State*, 297 Ga. 845, 851–52 (2015) (concluding that, where witness intimidation evidence is admissible, counsel's failure to object to such evidence does not constitute deficient performance).

Moreover, Dickerson failed to establish that trial counsel's chosen defense strategy of attacking McKinney's credibility through cross-examination, rather than objecting to the witness intimidation

evidence, was objectively unreasonable. See *Johnson v. State*, 294 Ga. 86, 92–93 (2013) ("[C]ounsel's decision not to object to [witness's] testimony and to instead cross-examine [witness] … was a matter of trial strategy and was not so patently unreasonable that no competent lawyer would have made the same decision."). Therefore, Dickerson has failed to show that his trial counsel performed deficiently, and this claim fails.

(b) Dickerson also argues that his trial counsel was ineffective because he requested jury instructions on witness intimidation and flight. Dickerson's trial counsel requested – and the trial court gave – the following jury charge:

> Evidence of alleged flight or intimidation of witnesses has been introduced. Such evidence is governed by the rules concerning circumstantial evidence you have already been given. Furthermore, you may only consider it if you find more likely than not that the Defendant actually committed such act, and that the reason was to evade the charge now on trial.

At the motion for new trial hearing, counsel testified that he pulled the language from the pattern jury charges. And though "in hindsight" he would not have requested the charge because it was

21

"not favorable," he believed that the evidence of Dickerson's flight was "not evidence of guilt." Assuming without deciding that the charge was improperly requested, we discern no prejudice. See *Floyd v. State*, 318 Ga. 312, 323 (2024) ("[T]rial counsel's failure to request appropriate jury instructions … is prejudicial if but for the errors, there is a reasonable probability that the result of the proceeding would have been different.").

As discussed above, the defense presented evidence at trial that Dickerson was not connected to the threats against McKinney or Wright. The defense also presented evidence that Dickerson did not flee to evade the charges against him but had planned to go to New Jersey prior to Givens's murder. He told several people prior to Givens's murder that he needed money because he wanted to go back to New Jersey. And Dickerson visited the crime scene and got his oil changed before leaving Swainsboro, which were delays that the defense argued would not have been risked if Dickerson had been fleeing after a crime. Thus, the jury's consideration of the evidence involving threats made against witnesses and Dickerson's

travel to New Jersey was curtailed by the instruction because the defense's theory was that Dickerson did not "actually commit[] such act [of intimidating or fleeing]" and that he did not go to New Jersey to "evade the charge now on trial." As the defense noted in closing:

> There's been much made about Mr. Dickerson going to New Jersey, and about Mr. Dickerson's actions on the night afterwards. … He goes with his girlfriend … to the scene of the crime. Now, look, if he's running, if he's fleeing, if he's trying to get out of town, why would you go to the scene of the crime? You wouldn't. Then, if he's running, if he's fleeing, why would you go get your oil changed? Getting your oil changed is what you do when you're going on a vacation. … If you think the law is hot and after you, you will be gone.

Because this defense theory was consistent with the jury instruction as given, we fail to see how reasonable jurors would interpret this instruction in a manner that was harmful to Dickerson.

Further, any alleged harm resulting from this jury instruction was clearly outweighed by the compelling evidence of Dickerson's guilt. As discussed above, the evidence of Dickerson's guilt was very strong. Pullens, Gardner, and Wright testified about Dickerson's need for money, his odd behavior around Givens at the block party,

23

and even his later admission to shooting Givens. McKinney was an eyewitness to the crime and identified Dickerson as the shooter. Dickerson's ex-girlfriend testified that Dickerson called her just minutes after Givens had been shot to explain the situation. While visiting the crime scene, Dickerson correctly identified where Givens had been shot. And McCann-Bell testified that Dickerson cleaned a gun and packed his things the day after the murder and that they then left for New Jersey. Given this substantial evidence, we conclude that it is unlikely that, but for counsel's alleged deficient performance, the outcome of Dickerson's trial would have been different.

(c) Dickerson next argues that his trial counsel was ineffective because he failed to object to inadmissible and prejudicial hearsay. Assuming without deciding that Dickerson's trial counsel was deficient in his failure to object to these statements, Dickerson has failed to show that he was prejudiced by the error.

At trial, Denson's ex-girlfriend testified that Denson, who was with Dickerson at the time of the shooting, called her from a

24

"restricted" number the morning after Givens's murder. He told her that he and "John" were present during the shooting, but that "[Denson] didn't know that s\*\*t was going to go down." Denson then asked the ex-girlfriend to "bring him clothes," but she refused because she did not want to get involved. The ex-girlfriend testified that Denson "disappeared" after that.

Dickerson argues that this testimony was prejudicial because his defense was that he was neither involved in nor present at the scene of Givens's murder. But the other evidence of his presence at the scene – most notably, McKinney's eyewitness account identifying Dickerson as the shooter, Dickerson's actions after the murder, and Dickerson's own admissions to Wright that he shot Givens – renders cumulative the testimony from Denson's ex-girlfriend describing Dickerson's presence at the crime scene. See *Collins v. State*, 321 Ga. 215, 220 (2025) ("[T]he erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is introduced."). Accordingly, Dickerson's claim fails.

(d) Dickerson argues that his trial counsel was ineffective because he failed to object to irrelevant and highly prejudicial character evidence.[8] Because any objection by trial counsel would have been meritless, this claim fails.

At trial, McCann-Bell and Dickerson's ex-girlfriend both testified about their relationships with Dickerson. On cross-examination, trial counsel impeached McCann-Bell about her initial story to the police regarding how and when Dickerson obtained the gun she saw him with. On redirect, the State asked her if she was afraid to testify against Dickerson, to which she answered "no." But when asked about her relationship with Dickerson, McCann-Bell testified that Dickerson was "verbally, mentally, and physically abusive" towards her and that he "put a gun to [her] throat" within the past year. She also recalled that Dickerson had previously

---

[8] While Dickerson does not cite to OCGA § 24-4-401 ("Rule 401") (relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence") or Rule 404(b), we construe his argument to mean that his trial counsel was ineffective for failing to object on these bases.

26

mentioned "rob[bing]" both his cousin and Givens. Dickerson's ex-girlfriend initially denied some of the statements that she made to investigators about the phone call she had with Dickerson after the murder, but the State refreshed her recollection with an investigative summary. She was then asked if she had a peaceful relationship with Dickerson, to which she answered "[f]or the most part of it, yes." As the State pressed the issue, she responded that she had some physical conflict with Dickerson and that he "bit" her once. Counsel testified at the motion for new trial hearing that he did not object to this evidence because he "didn't consider [McCann-Bell] really as important a witness[] as … McKinney and some of the others" and that he was "more focused on just trying to get … McKinney's credibility destroyed."

OCGA § 24-6-622 ("Rule 622") provides that "[t]he state of a witness's feelings towards the parties and the witness's relationship to the parties may always be proved for the consideration of the jury." In *McNabb v. State*, 313 Ga. 701, 715 (2020), we held that "the nature of the relationships between the witnesses and defendants

was relevant, as the jury's understanding of a familial relationship between a defendant and a witness could affect the jury's assessment of the witness's credibility or potential bias and provide context for the witness's testimony." Id. Similarly, the evidence of Dickerson's prior violence committed against these witnesses was relevant, see Rule 401, to show why their testimony might have been more favorable to Dickerson at trial than their initial statements to police before trial due to fear of retaliation.

Dickerson contends that there was no evidence in the record to indicate that McCann-Bell or Dickerson's ex-girlfriend was reluctant to testify or that the alleged physical abuse was connected in any way to their testimony in this case. Though neither witness claimed to be fearful of testifying against Dickerson, the past acts described by them were admissible under Rule 622 to explain their potential biases towards Dickerson, why they may have omitted or minimized facts in favor of Dickerson, and the power and control dynamics of the relationships that might have affected their credibility.

Moreover, Dickerson's other acts of physical violence towards McCann-Bell and his ex-girlfriend were not introduced for improper propensity purposes as contemplated by Rule 404(b) because the State did not use this prior violence to show propensity. Rather, it was used to show the witnesses' feelings towards and relationships with Dickerson, a purpose not prohibited by Rule 404(b). See *Virger v. State*, 305 Ga. 281, 295 (2019) (evidence that a defendant had previously been abusive towards a witness was admissible when "not introduced for one of the purposes listed in OCGA § 24-4-404(b)" but rather "to show [the witness's] bias with regard to [the defendant] under OCGA § 24-6-622"). Because this was a proper reason to introduce the evidence and any objection to its admission would have been unsuccessful, Dickerson has failed to show that his trial counsel was deficient. See *McNabb*, 313 Ga. at 715 (concluding that any objection to evidence about the relationship between a defendant and a witness as irrelevant "would have been futile, and the failure to make such an objection cannot form the basis of a claim of ineffective assistance").

5. Finally, Dickerson argues that he was prejudiced by the cumulative effect of the above errors. Because we assumed error in Division 2 relating to the trial court's admission of extrinsic evidence from a prior shooting, assumed deficiency in Division 4(b) relating to trial counsel's request for jury instructions on witness intimidation and flight, and assumed deficiency in Division 4(c) relating to trial counsel's failure to object to certain hearsay statements, we consider whether the cumulative prejudicial impact of these errors requires a new trial. Under *State v. Lane*, 308 Ga. 10, 17 (2020), we must "consider collectively the prejudicial effect, if any, of trial court errors, along with the prejudice caused by any deficient performance of counsel."[9] To establish cumulative error, a defendant must show that "at least two errors were committed in the course of the trial" and that "the multiple errors so infected the jury's

---

[9] We also assume without deciding that the evidentiary error and the instructional error may be aggregated for cumulative-error review. See *Jones v. State*, 314 Ga. 605, 617 n.9 (2022) (noting the explicit language in *Lane*, 308 Ga. at 17 – which involved only evidentiary errors that are easily cumulated – that "[s]ome other types of error may not allow aggregation by their nature, but that question is not presented here").

deliberation that they denied the petitioner a fundamentally fair trial." *Lane*, 308 Ga. at 21.

Though we assumed without deciding the presence of several errors in the course of Dickerson's trial, they each produced very little, if any, harm, as explained in the respective divisions above. See *Quintanar v. State*, 322 Ga. 61, 75 (2025). And the properly admitted evidence against Dickerson was very strong, as discussed above. Id. We therefore conclude that Dickerson has failed to establish that the combined prejudicial effect of these errors requires a new trial. See *Jackson v. State*, 317 Ga. 95, 106–07 (2023) (considering several assumed errors and finding no cumulative prejudicial impact that would require a new trial).

*Judgment affirmed. All the Justices concur.*